**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRENT BOYD,

       *Plaintiff-Appellant,*

v.

BERT BELL/PETE ROZELLE NFL
PLAYERS RETIREMENT PLAN; NFL
PLAYER SUPPLEMENTAL DISABILITY
PLAN; THE DISABILITY BOARD,

       *Defendants-Appellees.*

No. 03-56514

D.C. No.
CV-01-02072-NAJ

OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted
December 10, 2004—Pasadena, California

Filed June 13, 2005

Before: Robert R. Beezer, Cynthia Holcomb Hall, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Beezer;
Concurrence by Judge Wardlaw

## COUNSEL

Lawrence D. Rohlfing, Law Offices of Lawrence D. Rohlfing, Santa Fe Springs, California, for the plaintiff-appellant.

John P. McAllister, Groom Law Group, Washington, DC, for the defendants-appellees.

## OPINION

BEEZER, Circuit Judge:

Former professional football player Brent Boyd appeals the denial of football degenerative disability benefits under the

Bert Bell/Pete Rozelle National Football League Player Retirement Plan ("the NFL Plan" or "Plan"). The Plan provides retirement, disability, and other benefits to eligible current and former professional football players. The district court granted the NFL Plan's motion for summary judgment, holding that the Plan's Retirement Board ("the Board") did not abuse its discretion in denying Boyd's claim for football degenerative disability benefits. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we AFFIRM.

I

Brent Boyd was drafted in the third round of the 1980 National Football League ("NFL") draft by the Minnesota Vikings and was an offensive lineman for the Vikings until his retirement from the league prior to the 1987 season.[1] After his retirement, Boyd claimed approximately $82,000 from settling claims he asserted under California Worker's Compensation system as a result of several injuries, but not including any specific head trauma. Boyd held various jobs until August 1999, when he was no longer able to work.

In March 1997, Boyd filed his first application for football degenerative disability benefits under the Plan. The application claimed benefits based on orthopedic joint problems that resulted from NFL injuries. In his application, Boyd told the committee that his "first and most serious NFL injury" was a knee injury that occurred in October 1981. Boyd wrote, "I know I have the mind and spirit to succeed in an occupation, but my body refuses to cooperate." Boyd's application neither noted nor alleged any brain injuries or head trauma, and his medical history before 2000 reveals reports and diagnoses of alcohol abuse, depression, digestive tract disorders, and hypertension, but no complaints or findings of brain disorders

---

[1]According to Boyd's opening brief, "The purpose of an offensive lineman is simple: he must become the irresistible force moving the defense or the immovable object precluding the undaunted pass rush."

or injuries. Boyd's 1997 claim was denied by the Board, based on a medical opinion that Boyd could work so long as it did not involve certain physical elements. Boyd did not appeal.

In June 2000, Boyd again applied to the NFL Plan for disability benefits, this time citing alleged organic brain problems as the result of an alleged head trauma. It is this application for benefits that is in dispute. Boyd claims that he was knocked unconscious during a preseason game in August 1980, and that despite having temporary blindness in his right eye during the game, he continued to play. Other than this alleged incident in August of 1980, Boyd does not recall losing consciousness at any other time. Boyd claims that in 1980 he began experiencing constant headaches, which the Vikings personnel told him were a side effect of anti-inflammatory medication (Indocin) to treat pain and inflammation of the knees. Boyd told the NFL Retirement Board that as the headaches began, it was then that he first began using alcohol on a habitual basis. As his football career developed, Boyd claims that he noticed increasing fatigue, increased forgetfulness, and lack of focus. Boyd currently complains of "a general constant flu-like feeling, fatigue, headaches, queasiness, forgetfulness, intermittent blurred vision, difficulty reading, lack of concentration, learning difficulty, memory loss, dizziness and light-headedness."

The NFL Plan is governed by the Employee Retirement Income Security Act ("ERISA") and was established pursuant to collective bargaining agreements between the National Football League Players Association ("Players Association") and the National Football League Management Council ("Management Council"). The NFL Plan is administered by a Retirement Board composed of six voting members, three of whom are appointed by the Players Association, while the other three members are selected by the Management Council. The members of the Board serve without pay. The NFL Plan grants to the Retirement Board the "full and absolute dis-

cretion, authority and power to interpret, control, implement, and manage the Plan," including the authority to adjudicate claims for benefits.

The NFL Plan provides for monthly total and permanent disability benefits ("T&P Benefits") to an Active Player or Vested Inactive Player whom the Retirement Board determines to be totally and permanently disabled. In his 2000 application, Boyd applied for both Football Degenerative and Inactive T&P Benefits, two of four categories of T&P benefits provided by the Plan:

> [5.1](c) (Football Degenerative). The monthly total and permanent disability benefit will be no less than $4,000 *if the disability(ies) arises out of League football activities,* and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of the Player's last Credited Season.

> [5.1](d) (Inactive). The monthly total and permanent disability benefit will be no less than $1,500 *if (1) the total and permanent disability arises from other than League football activities* while the player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities, and results in total and permanent disability after the later of (i) age 45, or (ii) 12 years after the end of the Player's last Credited Season. The minimum benefits provided under this Section 5.1(d) will be offset by any disability benefits provided by an employer other than the League or an Employer, but will not be offset by worker's compensation.

NFL Retirement Plan at §§ 5.1(c), 5.1(d) (emphasis added).[2]

---

[2]The Plan offers two other types of T&P disability benefits, which Boyd did not claim. Section 5.1(a) of the Plan (referred to as the "Active Football" disability benefit) provides for a disability that results from League

The 1993 Collective Bargaining agreement created a new NFL Player Supplemental Disability Plan, which provides additional monetary benefits to certain former players who qualify for benefits under sections 5.1(a)-5.1(c) of the Plan.

Section 5.1 of the Plan was amended in 1998 ("1998 Amendment"), which limits the recovery of disability benefits as a result of a psychological/psychiatric disorders but provides:

> [A] total and permanent disability as a result of a psychological/psychiatric disorder may be awarded under [inter alia, the Football Degenerative category] if the requirements for a total and permanent disability are otherwise met and the psychological/psychiatric disorder either (1) *is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g.*, *repetitive concussions*); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for total and permanent disability benefits under Section 5.1(a).

NFL Retirement Plan at § 5.1 (amended November 1, 1998) (emphasis added).

In December 2000, the Retirement Board determined that Boyd was totally and permanently disabled within the mean-

---

football activities, arises while the player is active, and causes permanent and total disability shortly after the disability first arises. Section 5.1(b) (referred to as the "Active Nonfootball" disability benefit) provides for benefits if the disability does not arise from League football activities but does arise while the player is an active player and causes permanent and total disability shortly after the disability first arises.

ing of the Plan and voted to grant Boyd T&P Inactive benefits of $1,550 per month, retroactive to October 1, 1999, pursuant to Plan section 5.1(d). The Board deferred consideration of Boyd's claim for Football Degenerative benefits under section 5.1(c).

In considering whether Boyd qualifies for Football Degenerative disability benefits pursuant to Plan section 5.1(d), the Board reviewed the medical opinions of various health professionals. We turn to discuss part of that body of medical evidence.

Plan neutral physician Dr. J. Sterling Ford, a neurologist, concluded in his narrative report that "[f]rom a neurologic standpoint, [Boyd] does appear to have several problems that may arise out of head injuries suffered in the course of his NFL career. Only further testing will be able to determine the extent of those injuries." Dr. Ford observed that Boyd's symptoms "raise the question of possible organic brain injury." On a standardized form that the Board asked Dr. Ford to complete, Dr. Ford checked "yes" after being asked whether the injury resulted from a football-related activity.

At Boyd's request, Dr. Daniel Amen and Dr. Edward Spencer conducted a SPECT (single photon emission computed tomography) brain scan on Boyd, which seeks to measure brain metabolic activity. Dr. Spencer concluded that Boyd's scan revealed decreased brain activity, "consistent with head trauma." Without identifying any cause, Dr. Spencer concluded that Boyd "is disabled due to his brain injury."

The Board referred Boyd to Dr. Branko Radisavljevic, a Plan neutral psychologist. Dr. Radisavljevic concluded that Boyd was disabled as a result of "emotional liability depression due to post traumatic organic brain disorder." Dr. Radisavljevic wrote that Boyd's disability "appears to be the result of a fairly small brain injury that I cannot fully understand." On the Board's standardized "Physician's Report" form, Dr.

Radisavljevic checked "yes" when queried whether Boyd's disability resulted from a football-related activity.

In 2001, the Board referred Boyd to Dr. Barry Gordon, the Director of Cognitive Neurology and Neuropsychology and the Memory Clinic at Johns Hopkins Hospital. Boyd was subject to nearly two days of examinations and neuropsychological testing, including a 100-minute examination by Dr. Gordon himself. Dr. Gordon concluded:

> Based on the evidence available, the alleged head injury of August, 1980 could not be organically responsible for all or even a major portion of the neurologic and/or neuropsychologic problems that Mr. Boyd is experiencing now, to a reasonable degree of medical probability. (I include the allegedly abnormal SPECT scan results in this category.) This is true even allowing for the many unknowns about this injury, including its precise severity. Many if not most or all of his complaints are more typically those attributable to depression and/or chronic pain and/or to the effects of untreated hypertension and physical deconditioning.

> To reasonable degree of medical probability, the depression that Mr. Boyd is currently experiencing (by report) could not be an organic consequence of the head injury of August, 1980.

> Many feel that chronic pain can be a cause of depression, and chronic pain itself has been reported to cause impairments in neuropsychologic performance (although not necessarily impairments in underlying cerebral functions[]). Mr. Boyd has previously reported pain from musculoskeletal injuries related to his football playing. I note these possible explanations and connections, although determination of the orthopedic source(s) of his pain, his reported depres-

sion, and possible connections between the two are not within my area(s) of expertise.

In April of 2001, the Board denied Boyd's claim for Football Degenerative disability benefits, explaining that "Mr. Boyd's disabilities do not arise out of League football activities, and that Mr. Boyd therefore does not qualify for Football Degenerative T&P benefits."[3] Boyd subsequently filed this lawsuit.

On remand from the district court, in January 2003, the Board reconsidered its decision in view of the 1998 Amendment to the Plan. The Board concluded that the amendment "only limit[s], and do[es] not expand, the availability of Football Degenerative T&P benefits" and so does not give rise to a less rigorous standard than that set forth by Plan Section 5.1(c) under which Boyd could qualify for Football Degenerative disability benefits.

The district court granted summary judgment for the Board, concluding that "[t]he Board's reliance on Dr. Gordon's medical expertise constitutes substantial evidence upon which the decision may stand."

---

[3]The Plan defines "Arising out of League football activities" as:

a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. "Arising out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

NFL Retirement Plan at § 6.4(c) (amended effective July 1, 1993).

## II

**[1]** The NFL Plan was established pursuant to collective bargaining and grants to the Retirement Board the full discretion to adjudicate claims and interpret the Plan. We review the Board's decision to deny Boyd's football degenerative disability benefits for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Jones v. Laborers Health & Welfare Trust Fund,* 906 F.2d 480, 481 (9th Cir. 1990) (recognizing that we "will not upset the review process the parties have [collectively] bargained for, absent an abuse of discretion by the Board."). An ERISA fiduciary is "obligated to guard the assets of the [Plan] from improper claims, as well as to pay legitimate claims." *Brogan v. Holland,* 105 F.3d 158, 164 (4th Cir. 1997) (internal quotations and ellipsis omitted). Our deferential standard of review furthers a primary goal of ERISA, which endeavors "to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." *Taft v. Equitable Life Assurance Soc'y,* 9 F.3d 1469, 1472 (9th Cir. 1993).

**[2]** "In the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion." *Taft,* 9 F.3d at 1473. An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact. *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 944 (9th Cir. 1999); *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1323-24 (9th Cir. 1995).

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 622 (1993), quoting

*United States v. United States Gypsum Co.,* 333 U.S. 364, 395
(1948). We will uphold the decision of an ERISA plan admin-
istrator "if it is based upon a reasonable interpretation of the
plan's terms and was made in good faith." *Estate of Shockley
v. Alyeska Pipeline Serv. Co.,* 130 F.3d 403, 405 (9th Cir.
1997) (internal quotations omitted).

## III

We consider whether the Retirement Board abused its dis-
cretion when it determined that Boyd's total disability did not
arise out of his League football activities. Boyd argues that
the NFL abused its discretion by relying on what Boyd casts
as the "incomplete and lone contrary [medical] opinion [of
Dr. Gordon] in the record." Essentially, Boyd argues that the
Board relied on clearly erroneous findings of fact when it
determined that Boyd's disability did not arise from League
football activities. We reject this contention.

[3] To hold that the Board abused its discretion, we would
have to conclude that the entire record leads to a "definite and
firm conviction that a mistake has been committed" by the
Board in concluding that Boyd's disability did not arise from
his football career. *Concrete Pipe,* 508 U.S. at 622. This we
cannot do. What is transparent from the record is that the
cause of Boyd's disability is far from clear. That is, the evi-
dence can reasonably be interpreted to conclude that Boyd's
disability either is or is not linked to his football career. The
Retirement Board reasonably concluded, based on Dr. Gor-
don's extensive evaluation and report, that Boyd's disability
did not arise from his League football activities. We are
unable to conclude that the Board abused its discretion in so
concluding.

[4] Boyd's claim is not saved by relying on what he charac-
terizes as the medical experts who expressed the opinion that
Boyd's disability does arise from his League football activi-
ties. An ERISA administrator's exercise of its discretion to

adjudicate claims is not a mere exercise in expert poll-taking. We hold that a mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused its discretion, for even a single persuasive medical opinion may constitute substantial evidence upon which a plan administrator may rely in adjudicating a claim.

[5] Further, even the experts that Boyd claims to be in his corner fail to unequivocally conclude that Boyd's disability arises from his football career. For example, although Dr. Ford checked the box on the Retirement Board form indicating that Boyd's disability arose from his football career, in his more-detailed narrative report, he wrote that Boyd "does appear to have several problems that *may* arise out of head injuries suffered in the course of his NFL career. Only further testing will be able to determine the extent of those injuries." (emphasis added).[4] For his part, Dr. Spencer identified decreased brain activity "*consistent with* head trauma" (emphasis added), and without identifying any specific cause, concluded that Boyd "is disabled due to his brain injury." As did Dr. Ford, Dr. Radisavljevic checked the box indicating that the injury arose from Boyd's football career, but concluded in his narrative report that Boyd's disability "appears to be the result of a fairly small brain injury that I cannot fully understand." Dr. Radisavljevic also noted that Boyd was "somewhat obese," and in contravention to Boyd's claimed symptoms of memory loss and forgetfulness, Dr. Radisavljevic noted that Boyd "scored 30 out of 30 on the mini mental state exam which included multiple cognitive functions." In light of what the Board apparently construed as inconsistent or incomplete reports, the Board did not abuse its discretion in referring the matter to Dr. Gordon, who reportedly is a noted neurologist, and ultimately relying on Dr. Gordon's report to conclude that Boyd's disability did not arise from his football career.

---

[4]Dr. Gordon presumably performed the further neuropsychological testing that Dr. Ford recommended.

IV

The Retirement Board did not abuse its discretion in concluding that Boyd's disability did not arise from his League football activities.

AFFIRMED.

---

WARDLAW, Circuit Judge, concurring in part and concurring in the result:

I part company with the majority's inclusion of the dictum on pages 7026-27, where the opinion states: "An ERISA administrator's exercise of its discretion to adjudicate claims is not a mere exercise in expert poll-taking. We hold that a mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused its discretion." The opinion reaches the correct result solely because the standard of review is "significantly deferential" to the Board; we may not hold the Board's factfinding to be erroneous unless the "entire evidence" leaves us with "the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602 (1993). Moreover, "that the plan administrator's decision is directly contrary to some evidence in the record does not show that the decision is clearly erroneous." *Snow v. Standard Ins. Co.*, 87 F.3d 327, 331 (9th Cir. 1996). My conclusion that the Board did not abuse its discretion under this standard is based on the fact that Boyd's head injury was not contemporaneously diagnosed, and therefore it was not unreasonable for the Board to rely upon Dr. Gordon's opinion that Boyd's head injury did not arise from his football activities. Because the opinion's conclusion is based on the deferential nature of the abuse of discretion standard of review applicable to this case, both the tone and substance of the quoted sentences are unnecessary.