Afsaneh SAFAVI, Plaintiff,

v.

SBC DISABILITY INCOME PLAN; an ERISA plan; Does 1 through 10, inclusive, Defendants.

No. CV06–01324ABC(CTX).

United States District Court, C.D. California.

June 26, 2007.

Charles J. Fleishman, Charles J. Fleishman Law Offices, Beverly Hills, CA, Caroline Lee Elkin, J. Al Latham, Jr., Stephen H. Harris, Paul Hastings Janofsky and Walker, Los Angeles, CA, for Plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COLLINS, District Judge.

Plaintiff Afsaneh Safavi ("Plaintiff") filed her Opening Brief on April 20, 2007. Defendant SBC Disability Income Plan ("Defendant") filed its Trial Brief on April 23, 2007. On May 11, 2007, Plaintiff filed her Reply Brief. On May 14, 2007, Defendant filed its Response Brief. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7–15, the Court found this matter appropriate for decision without oral argument and the court trial calendared for June 25, 2007, was vacated.

After considering the evidence, briefs and argument of counsel, the Court makes the following findings of fact and conclusions of law:

### Findings Of Fact [1]

#### I. Introduction

This is an action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA") for recovery of long term disability benefits under the AT & T Disability Income Plan (formerly known as SBC Disability Income Plan, hereinafter the "Plan"). On March 9, 2006, Plaintiff filed a Complaint with this Court seeking review of AT & T's (formerly known as SBC) cancellation of Plaintiff's long term disability ("LTD") benefits under the Plan.

#### II. Facts

On July 1, 1998, Plaintiff began working for Pacific Bell Telephone Company ("Pacific Bell"). (Administrative Record ["AR"] at 268). Plaintiff was employed by Defendant as a Data Solutions Manager. The description of Data Solution Manager found in the Administrative Record is:

The Data Solutions Manager is considered a sedentary position. This is an out side sales job, requiring the EE to make 10–15 sales appointments per week. The EE is responsible for the sales of the entire suite of SBC products. The EE covers the greater LA area and is required to drive 50–100 miles a day. The EE makes face to face sales presentations, writes proposals, researches data and determines price

---

**1.** The Court has elected to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions, which aids appellate review and provides the parties with more satisfying explanations. Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

quotes. The EE must be well organized and have excellent communications skills. The EE is keyboarding frequently. This is a demanding job requiring the EE to work 10–15 hour days. The EE uses abstract thinking and reasoning skills, he/she deals with difficult customers on a daily basis. The EE works in a team and has a sales engineer that reports to him/her. Lifting, carrying, crawling, bending, stooping, and twisting are not required in this position.

(AR 335).

As an employee of Pacific Bell, Plaintiff became a participant in the Plan, which was established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") and entitled Plaintiff to short-term disability ("STD") and LTD benefits. At all relevant times, Plaintiff was a participant in the Plan. Under the Plan, "total disability" is defined to mean "you are prevented by illness or injury from engaging in any employment for which you are qualified or may reasonably become qualified for based on education, training or experience." (AR 937).

Pursuant to the terms of the Plan, AT & T is the Plan Administrator for claims made under the Plan and is also a Plan Fiduciary. (AR 1023). As the Plan Administrator, AT & T is authorized to appoint one or more Claims Administrators. (AR 1023 & 1025). AT & T entered into an agreement with Sedgwick Claims Management Services, Inc. ("Sedgwick") to act as the third-party Claims Administrator for the Plan. (AR 1341–1492). A group of Sedgwick employees, known collectively as the SBC Medical Absence and Accommodations Resource Team ("SMAART"), administers claims for LTD and STD benefits and reviews denials of claims under the Plan. (Declaration of Nancy Watts, ¶¶ 7 & 8; Declaration of Kimberly Brown, ¶¶ 4 & 6–8; Declaration of Tonya A. Warner, ¶ 3; see, e.g., Martin v. SBC Disability Income Plan, 2006 WL 3040926 at *1 & *7 (N.D.Tex. Oct. 26, 2006) (finding that SMAART was a collection of Sedgwick employees); see, also, Sorensen v. SBC Umbrella Plan No. 1, 2006 WL 335440 (E.D.Wis. Feb. 9, 2006)(same)).[2]

In November 1999, Plaintiff took a leave of absence for endometriosis. (AR 324). Plaintiff was approved for STD benefits under the Plan from November 8, 1999, until December 12, 1999. (AR 257). In January 2000, Plaintiff returned to work as a Data Solutions Manager.

On November 24, 2000, Plaintiff took a second leave of absence for flank pain, lower back pain, abdominal pain, and side pain caused by endometriosis. (AR 266). Plaintiff received STD benefits from December 4, 2000, until December 2, 2001. (AR 266). On June 9, 2001, Dr. Robert

**2.** Because the information contained in the declarations cited by the Court is both information known to the claims administrator (though not explicitly part of the administrative record) and does not go to the factual determinations of the claims administrator, the Court may consider this information in deciding the standard of review. *See, e.g., Abatie,* 458 F.3d at 969–70. In addition, because other Courts have concluded that SMAART is a group of Sedgwick employees dedicated to administering the Plan, the Court could make this same determination as a conclusion of law. However, other than using this information to assist in determining the standard of review, the Court has limited its review to materials found in the administrative record and, accordingly, has not considered any of the evidence obtained by Defendant after the denial of Plaintiff's appeal (which were Bates-stamped AT & T 1492–1656). *See, e.g., Id.* ("The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established by extrinsic evidence or otherwise.").

Morris, a psychologist who had been treating Plaintiff since April 19, 2001, filled out a SMAART form regarding her continued disability due to her mental health, and diagnosed her with depression and anxiety. (AR 254).

In October 2001, as Plaintiff's STD benefits were about to terminate and a decision regarding LTD benefits was being made, SMAART had Plaintiff examined by Dr. Sherry Mendelson, a psychiatrist. Dr. Mendelson concluded that Plaintiff:

> suffers from a depressive disorder and a generalized anxiety disorder ... At this point, MS. Safavi is still temporarily totally disabled ... Her concentration needs to improve, and her numerous fears about her body and about going out and being harmed need to improve before she is able to return to the work force in any capacity.

(AR 221). Dr. Mendelson also noted that Plaintiff "shows no grooming abnormalities." (AR 219).

Plaintiff received LTD benefits from December 3, 2001, until January 31, 2005, and never returned to work. (AR 266, 234–36). Along with providing Plaintiff LTD benefits, Defendant referred Plaintiff to Allsup, a company that represents applicants applying for Social Security benefits. (AR 99–108 & 142). Allsup assisted Plaintiff in applying for disability benefits. (*Id.*). In October 2002, Plaintiff was approved for Social Security Disability benefits. (AR 100). On November 14, 2002, SMAART wrote to Plaintiff and asked for the amount of money she had been overpaid in LTD benefits when combined with her retroactive Social Security disability benefits award. (AR 543). Plaintiff paid Defendant the money in early December 2002. (AR 531).

During the time Plaintiff received Plan benefits, she was required to periodically submit "additional objective medical information that supports your treatment provider's recommendation that you continue your disability benefits" to SMAART. (AR 384, 912). Accordingly, on January 1, 2005, and January 19, 2005, two of Plaintiff's treating physicians, Dr. Barry Leiberman, her psychiatrist, and Dr. Robert Morris, her psychologist, submitted information to SMAART that indicated Plaintiff had been participating in an acting class. (AR 385). On January 17, 2005, SMAART had Plaintiff's medical records reviewed by a consulting psychiatrist, Dr. Robert Reff, who also spoke to Dr. Morris and concluded that Plaintiff:

> ... has never been capable of obtaining a paying job acting, though she appears to be capable of going to the classes. It does not appear as if she has the capacity to function in any gainful way due to her paranoia. It does appear as if she is capable of adequately binding her paranoia while in class in order to further learn fantasy.

(AR 73). Dr. Morris also told Dr. Reff that Plaintiff appeared unkempt and disheveled at her appointments with him. (AR 385).

Because Plaintiff previously had represented to SMAART that she rarely left her home and was not involved in any social activities, SMAART conducted an investigation into Plaintiff's activities based upon her treating physicians' reports that she was participating in acting classes. (AR 384 & 385).

During its investigation, SMAART discovered Plaintiff's personal website, which included various photographs and a resume indicating that she had been in several movies and plays (including three movies in 2001 and 2002 when she was receiving disability benefits under the Plan). (AR 463–75). Surveillance of Plaintiff's activities was conducted from January 24, 2005, through February 3, 2005, and showed that she was physically

and socially active, and attended acting classes at the William Alderson Studio in West Hollywood. (AR 385). For example, in addition to attending her acting classes, Plaintiff was observed walking around a shopping mall, taking her daughter to the park and sitting on the bench while her daughter played, jogging to her car while carrying papers, putting items into her trunk, bending over, talking on the cell phone, driving, interacting with people in public. (AR 40–61). Moreover, during the observation period, Plaintiff appeared to be nicely dressed, and have her hair, make-up and nails done. (Id.).

After the surveillance was concluded, SMAART had Dr. Richard Harris, a psychiatrist, prepare a February 15, 2005, report based upon his review of Plaintiff's medical files and the report of the surveillance of Plaintiff, in which he concluded:

The most striking aspect of the total information reviewed is the discrepancy in terms of the claimant's self-report and also the therapist's report to Dr. Reff. Therapist and the claimant state that she rarely leaves home. In a conversation with case manager in December, she describes not having any social activities, does not go to grocery store, she only drives to doctor's appointments, she is not able to clean house or cook. This information is at odds with the treatment notes, which shows that she is going to auditions and acting class ... Dr. Morris reported to Dr. Reff that the claimant does not go out of the house; this is also reflected in his notes. The credibility of this claim has to be called into serious question. Furthermore, the doctor makes reference to paranoia and delusional state, but she is not on any antipsychotic medications and Dr. Lieberman has not made any reference to psychosis in his May letter. The depression that she was suffering from at the time when she went off work was likely not as severe as I had thought.

At this time, there is not enough evidence of significant limitation of function and there is strong evidence of demonstrating malingering.

(AR 36–40).

On February 17, 2005, Dr. Harris submitted a second report at SMAART's request after viewing the entire surveillance video to determine whether he might change his opinion regarding the discrepancy between Plaintiff's self-reports and her observable activities. (AR 34–5). In this report, Dr. Harris found:

The surveillance tapes actually demonstrate information that is in conflict with the claimant's self-report ... Answer to case manager question: Have [sic] already been done in the review yesterday. Again, this was a review only to look at the surveillance tapes. The surveillance tapes show what was documented in the reports of the surveillance tapes.

(AR 34–5).

SMAART found that Plaintiff's observed activities directly contradicted Plaintiff's reports to SMAART that she rarely left her home, was not involved in any social activities, and that her minimal activities of daily living were watching television and sleeping in late. (AR 384). SMAART also found that Plaintiff's appearance during the surveillance was in conflict with her appearance as described by Dr. Morris. (AR 385).

On March 3, 2005, after concluding its investigation into Plaintiff's activities, SMAART notified Plaintiff in writing that her claim for continued LTD benefits was denied because of: (1) the conflict between the information on her website and surveillance tapes and the information Dr. Morris, Dr. Lieberman, and Plaintiff had submitted in support of her claim; and (2) the lack of objective medical evidence that Plaintiff continued to be prevented by her

illness or injury from engaging in any occupation for which she was qualified based on her training, education, and experience. (AR 384–85). SMAART also informed Plaintiff that she had the right to both appeal its decision and submit additional medical or vocational information. (AR 385–86).

At the request of Plaintiff's attorney, SMAART granted Plaintiff a number of extensions to allow her sufficient opportunity to submit medical information in support of her appeal of the denial of her LTD benefits. (AR 384–86, 364–65, 363, 357–58, 607, 603, 602, 600, 597, 592, 590, 644, 586–88).

On August 26, 2005, Plaintiff's attorney submitted an appeal of the denial of her LTD benefits, including, among other things, additional notes and reports from a variety of her treating physicians, a medical history taken at Cedars–Sinai Hospital, and a letter from Plaintiff. (AR 644–76). For example, Dr. Mark Surrey, a fertility specialist, indicated in a March 16, 2005, letter that Plaintiff was under his care for "severe recurrent endometriosis with severe and debilitating pelvic pain" and that surgery was planned for the near future (which took place in April 2005). (AR 622, 778). Dr. Surrey also stated that Plaintiff was "disabled and unable to attend her regular work." (Id.).

Dr. Morris submitted an April 25, 2005, letter that commented on Plaintiff's mental condition as well as the videotape surveillance of Plaintiff. (AR 656–659). With respect to the videotape, Dr. Morris stated that "[i]t is very unlikely that the presence or absence of a clinical depression or a paranoid state can be made from watching a video tape of a few behaviors over a five day period" and attributed the fact that

Plaintiff did not look disheveled and unkempt during the period of the surveillance to the fact that Plaintiff's mother was visiting for the week and was a positive influence on Plaintiff's mental and physical state. (AR 658). Dr. Morris concluded that Plaintiff was "more likely than not unable to perform the duties required of her previous employment." (AR 659).

Dr. Paul Duran, a pain management specialist, discussed Plaintiff's pain caused by endometriosis, and the Vicodin and Vicopofen Plaintiff takes to control that pain in his June 29, 2005, letter, and concluded that "it is reasonable in her chronic pain condition, to work approximately one and a half to two hours in an eight hour period, including transportation time." (AR 646).[3]

On August 26, 2005, Plaintiff's attorney sent a letter to SMAART requesting that SMAART inform him of any information related to Plaintiff's claim that SMAART was missing. (AR 14–15). SMAART left a voice mail message for Plaintiff's attorney on September 7, 2005, informing him that he and his client were responsible for sending all medical information to add to the claim and that SMAART did not indicate what was missing. (Id.).

SMAART referred all of the medical documentation submitted by Plaintiff and her physicians (which included medical records for the time period of September 3, 1997, through August 2, 2005), the surveillance report, and information from Plaintiff's website to six independent physician advisors from Network Medical Review ("NMR") for an independent assessment of whether Plaintiff's evidence supported her claimed eligibility for LTD benefits under the Plan. (AR 635, 610–12, 613–16, 617–20, 621–24, 625–29, 609, 630–

**3.** Plaintiff submitted voluminous medical materials related to her alleged disability, spanning over a number of years. The letters submitted by Drs. Surrey, Morris, and Duran

are mentioned here as examples of the materials submitted by Plaintiff and because the matters discussed in them are disputed by the parties.

34). All six independent physician advisors found that while there was some documentation of various symptoms related to endometriosis, chronic pelvic pain, fibromyalgia, and major depressive disorder, there was a lack of objective medical information, to indicate that Plaintiff continued to be "totally disabled" under the Plan. (*Id.*).

For example, Dr. Robert N. Polsky, a psychiatrist, indicated there was a lack of evidence of any observable clinical findings, such as functional limitations or cognitive deficits that would have indicated that Ms. Safavi was unable to perform her job duties, such as evidence of mania, psychosis, or that Ms. Safavi had thoughts of harming herself or others. (AR 635, 637, 610–12). In addition, Dr. Polsky noted that Plaintiff did not appear to have any impairment in activities of daily living, and therefore concluded that there was insufficient clinical support to substantiate inability to perform job duties due to psychiatric disorder. (AR 612). Indeed, Dr. Polsky noted that Plaintiff herself admitted attending her three-hour long acting class since 1998. (AR 674).

Dr. Philip Jordan Marion, a pain management specialist, found there was no evidence of abnormal examination findings, abnormal radiological findings, or abnormal clinical findings that would have indicated that Ms. Safavi was unable to perform her job duties. (AR 613–16).

Dr. Marcel I. Horowitz, a urologist, concluded there were no abnormal clinical findings that would have indicated Plaintiff was unable to perform her job duties, such as evidence of a disabling urologic or urinary tract condition. (AR 616–20).

Dr. Joel B. Greenman, specializing in obstetrics and gynecology, found there was no evidence from the clinical findings that would support the presence of a disabling condition from any employment. (AR 621–24). For example, Dr. Surrey, Plaintiff's infertility specialist who had diagnosed Plaintiff with severe stage IV endometriosis and previously operated on her multiple times for that condition, in a conversation with Dr. Greenman, stated that Plaintiff should have been able to return to her normal job duties within the normal recovery time after her last laparoscopy, he was unable to explain the length of her disability, and he was "unwilling to comment as to whether she really was disabled from 02/01/05 until the present time." (AR 622). Accordingly, Dr. Greenman agreed with Dr. Surrey that Plaintiff had severe endometriosis, but Dr. Greenman did not find that the condition was debilitating enough to require Plaintiff to be considered "totally disabled" through the entire period she was collecting LTD benefits, and concluded that there was no evidence from a gynecologic standpoint to support Plaintiff's total disability after February 1, 2005. (AR 623).

Dr. Charles Brock, a neurologist, reported there was no evidence of focal neurological impairment and no objective qualification from the radiology standpoint, indicating the presence of lumbar disc degeneration. (AR 625–29).

Dr. Tanya C. Lumpkins, a rheumatologist, concluded that there was no evidence of musculoskeletal or neurological deficits which would have indicated that Ms. Safavi was unable to perform her job duties due to her fibromyalgia. (AR 609, 630–34). For example, Dr. Lumpkins noted that while Plaintiff seemed to have some tender points, there was a lack of objective documentation of a diagnosis of "sufficient severity" to preclude Plaintiff from working. Dr. Lumpkins concluded that based on the physical exam report, "Plaintiff would be expected to be independent with activities of daily living, able to perform transfers, able to ambulate without assertive devices,

and capable of performing the work of a sedentary position." (AR 632).

In addition, the medical documentation submitted by Plaintiff's own doctors lacked objective evidence of symptoms or injuries so severe as to prevent Plaintiff from engaging in any employment whatsoever. For example, Dr. Morris, Plaintiff's psychotherapist, described Plaintiff as a "depressed, fearful and highly anxious young woman" who is plagued by insomnia and fatigue that, along with her endometriosis, "greatly restricts her activities outside the home and her ability to concentrate and focus on everyday life tasks," but he did not think Plaintiff was at risk for a suicide attempt. (AR 657–58). Moreover, Dr. Morris did not conclude that Plaintiff was totally disabled as defined by the Plan, but that "Plaintiff is more likely than not unable to perform the duties of her previous employment." (AR 659). Many of Dr. Morris's findings related to Plaintiff's mental state, related to a time period well before February 1, 2005:(1) Dr. Morris's notes indicated that he had close to 200 meetings with Plaintiff through December 2004; (2) Plaintiff reported suicidal thoughts six times from 2001 to 2003; (3) Plaintiff had a history of two psychotic breakdowns, which were ten years ago and five years ago; (4) Plaintiff had another psychotic breakdown due to withdrawal from various prescribed drugs in November 2003; (5) Plaintiff failed to bathe regularly in 2002 and 2003; (6) Plaintiff was noted as saying she thought she was the reincarnation of Marilyn Monroe in September 2003; and (7) in October 2001, Dr. Sherry Mendelson, a doctor selected by AT & T, found Plaintiff to be "temporarily totally disabled." (AR 254, 493, 510, 526, 529, 524, 493, 525, 526, 507, 511, 89).

Dr. Duran, Plaintiff's pain management physician, stated that Plaintiff was taking Vicodin ES at the time that he saw her and stated that it "may effect [sic] her ability to concentrate, but do[es] not specifically effect [sic] her ability to sit, stand or walk." (AR 672). Dr. Duran also noted that Plaintiff self-reported pain, but that "this is, of course, strictly subjective. She had no objective evidence of muscular weakness. She has severe fatigue subjectively." (AR 672).

On December 15, 2005, Plaintiff's attorney sent a letter to SMAART questioning the accuracy of some of the reports by NMR physicians and requesting information about the relationship between SMAART and NMR. (AR 593).

On February 8, 2006, based upon a review of the medical documentation, including reports from over forty treating physicians and medical service providers from 1997 to 2005, the reports of NMR's independent physician advisors, and Plaintiff's personal website, SMAART denied Plaintiff's appeal and upheld the denial of Plaintiff's LTD benefits. (AR 586–588). SMAART specifically stated that:

> Although some findings are referenced, none are documented to be so severe as to prevent you from working at any occupation or employment for which you are qualified or may reasonably become qualified based on training, education and experience as of February 1, 2005.

(AR 588).

Approximately one month later, on March 6, 2006, Plaintiff filed her Complaint with this Court seeking review of AT & T's cancellation of her LTD benefits.

### Conclusions Of Law

### I. Jurisdiction And Venue

This action involves a claim for long term disability benefits under an employee welfare benefit plan regulated by ERISA. As such, the Court has original jurisdiction over this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). *See, e.g., Metro-*

*politan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Parrino v. FHP, Inc.,* 146 F.3d 699, 703–04 (9th Cir.1998). Venue in the United States District Court for the Central District of California is invoked pursuant to 29 U.S.C. § 1132(e)(2).

The parties do not dispute the facts requisite to federal jurisdiction and venue.

## II. Standard Of Review

A "denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan vests such discretionary authority in the administrator or fiduciary, the Court reviews the denial of benefits under the plan for an abuse of discretion. *Id.* However, in order for the abuse of discretion standard to apply, the Plan must unambiguously grant discretion to the administrator or fiduciary. *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1089 (9th Cir. 1999).

In addition, the abuse of discretion standard applies when discretionary authority has been delegated to a third party if: (1) the plan vests discretionary authority in the administrator or fiduciary; and (2) "a named fiduciary properly designates another fiduciary, delegating its discretionary authority ..." *Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d 1279 (9th Cir.1990) (abuse of discretion standard applied because plan gave discretionary authority to plan administrator and fiduciary who delegated its authority to a third party as required under the plan); *see also,* 29 U.S.C. § 1105(c)(1).

In this case, it is undisputed that the Plan unambiguously grants AT & T discretionary authority as the Plan Sponsor, the Plan Administrator, and a named fiduciary. It also is undisputed that the Plan allows AT & T to delegate its discretionary authority to a claims administrator.

The Court also concludes that AT & T's discretionary authority has been delegated to Sedgwick, as a Claims Administrator of the Plan. The Plan provides in relevant part at paragraph 5.5.4:

> ... [E]ach Claims Administrator and each subcommittee to whom claim determination or review authority has been delegated shall have full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan and determine the eligibility of any individual to participate in and receive benefits under the Plan.

(AR 1027). Sedgwick has been granted claim determination and review authority in its "Agreement for Administration of Disability Claims under SBC Disability Plans and Administration of SBC's Job Accommodation Process" with AT & T (the "Agreement"):

> [Sedgwick] shall provide Disability Claims Administration services, as more particularly provided below, necessary to approve or deny claims for short-term disability ... and long-term disability benefits ("Disability Claims") under SBC's Plans and to review denied Disability Claims on appeal as the plan fiduciary for such purposes under the Plans, as defined by ERISA.

(AR 1369). Sedgwick has a dedicated group of employees who process claims under the Plan, and these employees are known collectively as SMAART. Accordingly, the Court concludes that the Plan unambiguously vests discretionary authori-

ty to AT & T, and that authority has been delegated to Sedgwick.

█ Once the Court concludes that the Plan vests discretionary authority in the administrator or fiduciary, the Court must determine whether the administrator or fiduciary is operating under a conflict of interest. Under the Ninth Circuit's recent *en banc* decision in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (2006) in which the Ninth Circuit overruled *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317 (1995), the "[a]buse of discretion [standard of] review applies to a discretion-granting plan even if the administrator has a conflict of interest." *Abatie*, 458 F.3d at 965. However, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts § 187, Comment d (1959)." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (*quoted in Abatie*, 458 F.3d at 965).

In this case, Plaintiff "will have the benefit of an abuse of discretion review that ... considers the inherent conflict when a plan administrator is also the fiduciary, even in the absence of 'smoking gun' evidence of a conflict." *Abatie*, 458 F.3d at 969. The Court is to apply an abuse of discretion review which is "tempered by skepticism commensurate with the plan administrator's conflict of interest." *Id.* at 968. As the Ninth Circuit explained in *Abatie*:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to in-

vestigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id.* at 968–69 (internal citations omitted).

"What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Id.* at 969. In other words, "[a] district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." *Id.* at 968. "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* at 970. An administrator can present evidence outside of the administrative record demonstrating "that any conflict did not influence its decisionmaking process, evidence that would be helpful to determining whether or not it has abused its discretion." *Id.* An administrator might demonstrate the lack of a conflict by presenting evidence:

> ... that it used truly independent medical examiners or a neutral, independent review process; that its employees do not have incentives to deny claims; that its interpretations of the plan have been consistent among patients; or that it has minimized any potential financial gain

through structure of its business (for example, through a retroactive payment system).

*Id.* at 969.

■ In this case, through the use of Sedgwick and its designated employees known as SMAART, Defendant has delegated the entire claims review process to an independent third party. Declaration of Caroline L. Elkin., ¶ 5 & Exh. B. Sedgwick is paid a flat fee for its services to the Plan, unrelated to whether it finds for or against disability. *Id.* In addition, Sedgwick receives no incentive that would encourage it to deny claims. *Id.* AT & T exerts no control over any claims denial by Sedgwick or its employees, and does not otherwise encourage Sedgwick to deny claims. *Id.* Sedgwick, as the Claims Administrator for the Plan, utilizes another third-party vendor, Network Medical Review, to conduct file reviews for benefit claims. *Id.* AT & T plays no part in selecting medical and other experts. *Id.* Therefore, the Court finds that any structural conflict caused by Defendant being both the Plan Administrator and a fiduciary is mitigated by Defendant's delegation of its authority to an independent third party, Sedgwick. Accordingly, the Court concludes that Defendant's decision is entitled to credit and that the structural conflict of interest should not be weighed heavily by the Court in deciding whether Defendant abused its discretion.

## III. Discussion

Plaintiff advances several arguments in support of her claim and that she did not receive a full and fair review by Defendant. These arguments focus almost exclusively on certain alleged inadequacies regarding the investigation and reports of the NMR consulting physicians hired by SMAART to review Plaintiff's file.

### A. *Defendant Did Not Improperly Require Objective Evidence in Denying Plaintiff's LTD Benefits.*

■ For example, Plaintiff argues that Defendant improperly required her to support her claim with objective evidence. However, the letters denying Plaintiff's LTD benefits and denying her appeal make clear that Defendant weighed all the available evidence—both objective and subjective, both medical and otherwise—in reaching the decision. While the lack of objective evidence played an important part in the decision, the record does not demonstrate that Defendant improperly demanded objective evidence without informing Plaintiff or that it altered the requirements of the Plan.

Plaintiff essentially argues that Defendant should not be allowed to take the lack of objective evidence into account in making its decision, but instead should rely only on Plaintiff's subjective reports of pain and her doctors' opinions that she was disabled from performing any job. However, an administrator is not required to limit its review in this way. *See, e.g., Jordan,* 370 F.3d at 878 ("With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's reports for their diagnosis, their ipse dixit cannot be unchallengeable. That would shift the discretion from the plan administrator, as the plan requires, to the physicians chosen by the applicant who depend for their diagnosis on the applicant's reports to them of pain.").

Moreover, the requirement under ERISA that the plan administrator give "specific reasons" for the denial "is not the same thing as the reasoning behind the reasons." *Gallo v. Amoco Corporation,* 102 F.3d 918 (7th Cir.1996). For example, in *Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d 1279, 1286 (9th Cir.1990), the Court found

the administrator had adequately notified the plaintiff regarding the provisions of further medical information to support his benefit claim where:

> [t]he record shows that Metropolitan promptly notified Madden of its decision to terminate his Plan benefits, indicating that his benefit claim was denied because he was no longer "totally disabled" under the Plan. The record also shows that in this notice Metropolitan instructed Madden as to the proper method of appeal, specifically requesting the submission of any additional medical reports that would support his claim.

In this case, after reviewing all of the evidence as well as taking into account the treatment Plaintiff was receiving from her doctors and Plaintiff's own reports of pain, Defendant determined in its February 8, 2006, letter denying Plaintiff's appeal, that "[a]lthough some findings are referenced, none are documented to be so severe as to prevent you from working at any occupation or employment for which you are qualified or may reasonably become qualified based on training, education and experience as of February 1, 2005." (AR 588). Similarly, in its March 3, 2005, letter initially terminating Plaintiff's benefits, Defendant found:

> ... there is no evidence of any limitation of functioning to support your inability to perform your occupation.
>
> Since you do not have an illness or injury which prevents you from engaging in any occupation for which you are qualified based on your training, education and experience, you do not meet the definition of disability.

(AR 385).

This case is similar to *Jordan* where the consulting physicians did not disagree with the treating physicians and the plaintiff's contention that the plaintiff suffered from fibromyalgia, only whether or not the plaintiff's fibromyalgia was severe enough to qualify her as disabled. *Jordan*, 370 F.3d at 880. As the Ninth Circuit stated, "[t]hat a person has a true medical diagnosis does not by itself establish disability." *Id.* Similar to this case, the plaintiff's medical records:

> ... had a number of objective and subjective indications that her pain was not so severe as to prevent her from doing her work, such as her physician's observations that she was "in no acute distress," was "freely ambulatory," and had "no proximal muscle weakness" (weakness might indicate atrophy from pain-induced disuse). She reported activities, such as laundry, vacuuming, dusting, mopping, washing dishes, cooking, and shopping for groceries, that cut against a determination of severe pain, though a tough individual might perform such activities despite considerable pain.

*Id.* at 880. Furthermore, Plaintiff has "engaged in recreational and life activity inconsistent with [her] claim of disability." *See, also, Orndorf v. Paul Revere Life Insurance Company*, 404 F.3d 510, 526–27 (1st Cir.2005) (upholding denial of LTD benefits related to back injury for the plaintiff, who was a perfusionist, where he reported that his activities were limited and he remained indoors most of the time, but also reported to going on a long bike ride).

Contrary to Plaintiff's contention and as detailed in the findings of fact above, Defendant did in fact consider a variety of factors to determine whether Plaintiff's claim of continued total disability was credible. Defendant's letters denying Plaintiff's LTD benefits and her appeal provide a thorough explanation of its decision. Defendant did not improperly require only objective evidence nor did it totally discount Plaintiff's subjective reports of pain and emotional distress.

**B.** ***Defendant Did Not Improperly "Buttress" Its Decision to Deny LTD Benefits to Plaintiff in its Decision on the Appeal.***

Plaintiff also argues Defendant terminated her benefits initially without a thorough review and that it should not be allowed to "buttress" its decision on either the administrative appeal or before this Court. This contention is without merit. In this case the evidence weighing against Plaintiff—specifically, the inconsistencies between Plaintiff and her treating physicians' reports of disability and information contained in the surveillance tape and the treating physicians' notes and records— was already in the record at the time of the initial denial. It was this evidence, along with additional medical records and other materials submitted by Plaintiff, that the consulting physicians reviewed during the appeal in making their recommendation to uphold the denial of LTD benefits to Plaintiff.

This is not a case of the administrator arbitrarily refusing to look at evidence in support of a plaintiff's claim or needing specific medical records to support Plaintiff's claim and refusing to tell the plaintiff what those records were. *See, e.g., Booton v. Lockheed Med. Benefit Plan,* 110 F.3d 1461 (1997). Defendant advised Plaintiff to submit anything that she thought would help her appeal, and gave her numerous extensions of time in which to do so. The review of the available evidence by the consulting physicians on appeal was clearly not an attempt to "buttress" a record that was devoid of reason for denying Plaintiff's LTD benefits until that point.

**C.** ***Defendant's Consulting Physicians Were Not Biased.***

■ Plaintiff further claims that Defendant's NMR consulting physician were fi-

nancially biased and, therefore, their opinions should not be given any weight.[4] Plaintiff argues that NMR physicians are biased, in part, because NMR physicians generally perform a significant number of medical reviews for disability insurance providers. However, without more, this is insufficient to prove that the consulting physicians in this case were biased and that their reports should be disregarded.

Plaintiff also accuses the NMR consulting physicians of "cherry picking" in their reports by ignoring Plaintiff's subjective complaints and the conclusions of Plaintiff's treating physicians that are contrary to those of the consulting physicians. However, upon review, the reports of the consulting physicians in this case are far from being the rubber stamp that Plaintiff claims them to be. The consulting physicians appear to have reviewed all the available evidence and their reports account for the evidence that might support Plaintiff's claim. *See, e.g., Spangler v. Lockheed Martin Energy Sys., Inc.,* 313 F.3d 356, 362 (6th Cir.2002). The reports provide extensive analysis and consistently explain their conclusions.

Accordingly, the evidence in the administrative record and the extrinsic evidence provided by Plaintiff fails to establish that financial or other bias tainted the reports prepared by the NMR consulting physicians such that the Court should give less weight to Defendant's decision.

**D.** ***Defendant Was Not Required to Give Plaintiff's Treating Physicians' Opinions Deference.***

■ In addition, it is apparent that Plaintiff believes Defendant's decision should not be given deference because Defendant's consulting physicians failed to

---

**4.** In fact, Plaintiff's attorney referred to the consulting physicians at NMR as "medical whores" in his December 15, 2005, letter to SMAART. (AR 593).

properly credit the opinions of Plaintiff's treating physicians or to examine Plaintiff. However, there is no statutory or other requirement that Defendant's consultants must examine Plaintiff or consult with Plaintiff's treating physicians prior to rendering their opinions. In fact, "[a]s the Supreme Court has explained, '[n]othing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians.'" *Lawless v. Northwestern Mutual Life Insurance Company*, 360 F.Supp.2d 1046 (N.D.Cal. 2005) (*quoting Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)); *see, also, Boyd v. Bell*, 410 F.3d 1173 (9th Cir.2005) ("An ERISA administrator's exercise of its discretion to adjudicate claims is not a mere exercise in expert poll-taking. We hold that a mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused discretion, for even a single persuasive medical opinion may constitute substantial evidence upon which a plan administrator may rely in adjudicating a claim.").

Moreover, the consulting physicians considered the findings of Plaintiff's treating physicians, and based their findings that Plaintiff was not totally disabled in part on the findings of those physicians. Indeed, it is important to note that the consulting physicians did not conclude that Plaintiff was not suffering from endometriosis, fibromyalgia, or psychological issues. Rather, they conclude that given the evidence of her physical, cognitive, and psychological abilities as described by Plaintiff's treating physicians and Plaintiff herself, and as observed in the surveillance video, Plaintiff's condition did not rise to such severity that it would render her totally disabled. Furthermore, neither Defendant nor its consulting physicians were required to disregard the evidence found in Plaintiff's treating physicians reports, on Plaintiff's personal website, or through surveillance of Plaintiff that contradicted Plaintiff's subjective complaints of pain, fatigue, psychological distress, and lack of cognitive ability. *See, Hunt v. Metropolitan Life Insurance Company*, 425 F.3d 489, 490–91 (8th Cir.2005) ("Having carefully reviewed the record, we conclude that MetLife did not abuse its discretion in denying Hunt LTD benefits. Although we are mindful of Hunt's self-reported complaints of extreme tiredness, fatigue, mental confusion, loss of memory, anxiety attacks, and depression, and the opinion of Hunt's treating physician that RLS has rendered her totally disabled, MetLife was nevertheless entitled to rely on the opinions of two reviewing physicians who gave contrary opinions.").

### E. *The Social Security Administration's Finding That Plaintiff Was Disabled Is Not Contrary To Defendant's Denial of Plaintiff's LTD Benefits.*

■ Plaintiff also argues that Defendant's finding that Plaintiff is not totally disabled is inconsistent with the Social Security Administration's finding that she is. However, the Social Security Administration found her disabled in October 2002, a time during which Plaintiff was receiving LTD benefits from Defendant. The Social Security Administration had not re-examined Plaintiff's disability status in February 2005 when the decision was made to terminate Plaintiff's LTD benefits. Therefore, whether or not the Social Security Administration found Plaintiff disabled in October 2002 has no bearing on Defendant's determination that Plaintiff was no longer disabled under the terms of the Plan in February 2005. As the Court found in *Pari–Fasano v. ITT Hartford Life and Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir.2000) (emphasis in the original):

... the conclusions reached in appellant's social security litigation date from 1992. Appellee does not contest that appellant was disabled at the time; to the contrary, it concedes such disability. ITT Hartford's reason for terminating appellant's benefits was a lack of evidence that she remained disabled *in February of 1996.* On that issue, the social security litigation is singularly uninformative, because, although appellant continues to received social security disability benefits, no review of her eligibility has been undertaken since 1992.

Similarly, the voluminous medical records submitted by Plaintiff from the time prior to and during her receipt of LTD benefits do not call into question Defendant's decision to terminate Plaintiff's LTD benefits in February 2005. *Id.* at 420(finding that medical documentation from "well before the termination of [the plaintiff's] benefits" was "simply not enough to create a genuine dispute as to the reasonableness of ITT Hartford's termination decision.")

## IV. Conclusion

As the foregoing demonstrates, there was sufficient evidence in the medical records and other information for Defendant to conclude that Plaintiff was not disabled under the terms of the Plan. Defendant was entitled to exercise its discretion in determining Plaintiff's continued entitlement to LTD benefits, and the Court concludes that Defendant did not abuse that discretion in terminating Plaintiff's LTD benefits. In addition, Defendant's reasons for discontinuing Plaintiff's LTD benefits were consistent with its reasons for denying Plaintiff's appeal. Accordingly, the Court concludes that there was ample evidence in the Administrative Record to support Defendant's decision that Plaintiff was not suffering from a "total disability" as defined by the Plan on February 1, 2005, and the Court therefore finds in favor of Defendant. Defendant is ordered to submit a proposed judgment consistent with this Order within ten days of the date of this Order.