**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, and General Reinsurance Corporation, Appellants,**

v.

**IDAHO FIRST NATIONAL BANK, Executor of the Estate of V. A. Roberts, Deceased, and Ellen M. Roberts, Appellees.**

No. 18675.

United States Court of Appeals
Ninth Circuit.

Feb. 12, 1964.

Moffatt, Thomas, Barrett & Blanton, Willis C. Moffatt, and Eugene Thomas, Boise, Idaho, for appellants.

Anderson, Kaufman & Anderson, and Samuel Kaufman, Boise, Idaho, for appellees.

Before CHAMBERS, POPE and MERRILL, Circuit Judges.

POPE, Circuit Judge.

American Casualty Company, appellant here, brought this action in the district court against V. A. Roberts and his wife, to recover a sum in excess of one million dollars representing the company's loss as surety upon the performance bond of the contractors, hereafter named, who had undertaken to construct, for the United States Air Force, a Capehart housing project at the Amarillo Air Force Base in Texas. Prior to the execution of that bond by the appellant American Casualty, Roberts and his wife had executed, at the request of the contractors, an indemnity agreement agreeing to indemnify American Casualty against any loss which the latter might incur by reason of having executed the bond. The payments contemplated under the con-

tract were in excess of $7,750,000.[1] The contractors were V. O. Stringfellow, K. H. Vitt and Burl A. Johnson who had formed a so-called joint venture under the name of Stringfellow Amarillo Associates, under which name they bid on the contract. Before the contract had been completed the contractors defaulted and American Casualty was required to provide the necessary funds for its completion, in consequence of which, it suffered the loss mentioned. Roberts, when called upon, declined to undertake the completion of the job and the action was brought to recover the amount of the plaintiff's loss. Jurisdiction in the court below was predicated upon diversity of citizenship of the parties.

The district court found that American Casualty had been compelled, in the performance of its obligation under the bond which it executed upon the Amarillo Capehart construction contracts, to pay out the sum of $1,049,218.63 in order to complete the contract. This, the court found, represented the loss for which plaintiff was entitled to judgment against Stringfellow and Johnson. (Vitt was not served nor was he made a party.)

The court found that this was the sum for which the defendant Roberts agreed to indemnify the plaintiff. However, the court held that the defendant Roberts (and Roberts' estate, Roberts died pending the suit and his executor was substituted) were entitled to a credit against the plaintiff's claim of $1,049,-218.63 on account of certain matters set forth in the defendants' cross-complaint hereinafter described, said credit or offset being in the sum of $380,000. Accordingly, the court subtracted said last named sum from the said $1,049,218.63 and awarded judgment against the defendants in the principal sum of $669,-218.63 plus costs and attorneys' fees. The issues and questions arising upon this appeal have to do with the propriety of that credit or deduction from the total amount of defendants' loss.

Roberts' indemnity agreement, to which the Amarillo Associates and American Casualty Company were parties, was executed on September 9, 1958. When Roberts was first solicited by the associates to execute the indemnity agreement, for which he was to be paid an agreed consideration, he notified the plaintiff that he would make such an indemnity agreement on condition that he receive verified financial statements from each of the joint venturers and upon each of said joint venturers "assigning all of his assets to the undersigned as collateral security." This notification was through a letter, copy of which is set forth in the margin.[2] Two days later, on August 30, 1958, the associates Vitt, Stringfellow and Johnson, sent a telegram to American Casualty Company in

[1]. Actually the project was covered by three separate, but similar contracts. For convenience we here refer to the Amarillo projects and contracts as if they were but one.

[2]. "Boise, Idaho
August 28, 1958
American Casualty Company
Reading, Pennsylvania
Re: Capehart Housing Project,
U.S. Air Force,
Amarillo, Texas, Invitation
No. 41–623–58–62,
Stringfellow Amarillo Associates
Gentlemen:
You propose to write payment and performance bonds on the above construction project for each of the joint venturers consisting of Stringfellow Amarillo Associates; said joint venturers being V. O. Stringfellow, Burl Johnson and K. H. Vitt.

You are advised that upon receipt and verification by the undersigned of the financial statements of each of said joint venturers, and upon each of said joint venturers assigning all of his assets to the undersigned as collateral security, the undersigned will indemnify you on said payment and performance bonds in the aggregate approximate amount of $7,700,000, and will execute an indemnity agreement on the terms identical to the terms of the indemnity agreement dated January 18, 1957 on Fort Huachuca Capehart Housing Project, FHA Project No. 123–81001.
Very truly yours,
(signed) V. A. Roberts
V. A. Roberts"

care of Roberts at Boise, Idaho, (Roberts' residence) which read approximately as follows:

"American Casualty Company care of V. A. Roberts, Boise, Idaho. August 30, 1958   In consideration of Roberts indemnifying American Casualty Company for writing bonds in behalf Stringfellow Amarillo Associates covering 500 units Capehart housing project, Amarillo Air Force Base, I will execute indemnity to V. A. Roberts assigning my assets to him in manner set forth in agreement dated January 18, 1957 in connection with Fort Huachuca project.

K. H. VITT
V. O. STRINGFELLOW
BURL A. JOHNSON."

Upon receipt of that telegram Roberts apparently assumed that this was all he needed to satisfy the conditions which he had specified in his letter and proceeded then to execute the indemnity agreement mentioned.   It does not appear what finally became of the telegram itself or whether it was given by Roberts to American Casualty, but it does appear that an agent of American Casualty, one Baxter, had procured this telegram from the joint venturers and knew about it.   The same Baxter participated with Roberts' attorney in the drafting of the indemnity agreement and the procuring of certain exhibits and copies which were attached thereto.

Approximately a year later, in September, 1959, it became evident that the joint venturers on the Amarillo project were in financial trouble; that they were going to sustain a loss of at least $600,-000.   Mr. Bennett, also an agent of American Casualty, notified Roberts, as indemnitor, either to take over the job or do whatever was necessary to absorb the loss.   Roberts then requested his attorney and one Wise, a general contractor and professional engineer, to go to Amarillo, investigate the situation there, and report back.   On their return to Boise Bennett accompanied them when they reported to Roberts.   It was known at that time that the losses might amount to the sum previously mentioned, and Roberts advised Bennett that he was unable to take over the completion of the Amarillo job, or to furnish funds for its completion, partly because he was unable to liquidate his property holdings without excessive loss, and partly because he was then in very poor health.   Following this information, received from Roberts, American Casualty entered into a joint control agreement with the Amarillo Associates whereby American Casualty would advance the sum necessary and the housing project could be completed.   The project was completed and in the process American Casualty incurred the loss previously mentioned.

Vitt also was present during the conference at Roberts' house when the agent Bennett was present.   This occurred about October 4, 1959.   At that time the parties discussed the fact that the Associates, Stringfellow, Johnson and Vitt, were engaged in the performance of another Capehart contract for the construction of certain housing at a Navy installation at Whidbey Island in the State of Washington.   During the conference the parties were endeavoring to calculate what the ultimate loss might be; and at that time it was thought that there would be a $300,000 or $400,000 profit on the Whidbey Island job.   American Casualty was also surety on that job, but in respect to that surety contract it had no indemnitor and Roberts had no interest therein.

It ultimately developed that a substantial loss, approximately $600,000, was also sustained on the Whidbey Island project.   This was not known at the time of the October 4th conference.   Following that conference Bennett and Vitt proceeded to Whidbey Island and while they were then in the State of Washington, Bennett, acting on behalf of American Casualty, procured from Vitt and wife and Vitt Construction Company, Inc., an instrument in writing called "A General Pledge Agreement" dated October 10, 1959, whereby the Vitts and the Vitts' corporation did thereby "assign, transfer and pledge to American Casualty

Company" certain described corporate stock as security for the satisfaction of the Vitts' obligation to American Casualty to indemnify the latter on account of losses at Amarillo and at Whidbey Island. The pledge agreement contained the following provision: "It is understood and agreed that the net proceeds received from any sale or any part or all of the collateral pledged hereunder will be applied first to reimburse Surety for any loss attributable to the Department of the Navy project [Whidbey Island] and the balance, if any, shall be applied to reimburse Surety for any such loss sustained for the Amarillo Housing Projects."

Although it does not appear that agent Bennett personally knew of the agreement contained in the previously described telegram, what we have previously said respecting the manner of its drafting and sending discloses that American Casualty, itself, was chargeable with knowledge thereof at the time this pledge agreement was executed.

About the same time that the pledge agreement was drawn, the joint control agreement previously mentioned was executed and submitted to one of Roberts' attorneys, requesting Roberts' approval thereof. On October 14, 1959, this attorney wrote to American Casualty, communicating Roberts' consent to the joint control agreement. This letter contained the following paragraph: "We are also agreeable that additional security and collateral may be taken by American Casualty Company from the joint adventurers in Stringfellow Amarillo Associates, but insist and require that such additional security and collateral be devoted first to the payment of losses on the Amarillo Capehart Housing Project and secondly to losses, if any, on the Whidbey Island Capehart Housing Project." The record does not definitely show whether the attorney who wrote the letter had actually seen or knew about the pledge agreement.

The cross-claims, which the defendants asserted, related to two groups of items. The first group was the shares of stock described in the general pledge agreement, above mentioned, which it was stipulated had a value of $350,000. The second group was certain equipment, plant and tools located at the Amarillo Project having a value of $30,000. These last items, defendants alleged, had been assigned to American Casualty as protection and security for the completion of the Amarillo Project but that American Casualty permitted the same to be dissipated, removed or destroyed so that none thereof was used for the reduction of the loss as it should have been.

The trial court held that the defendants were entitled to both these credits, that is to say, $350,000 on account of stocks transferred to American Casualty upon the pledge agreement, and $30,000 on account of the dissipated equipment, or a total of $380,000. The court also held that against the loss incurred by the plaintiffs, $1,049,218.63, defendants were entitled to a set-off in the amount of $380,000, and the court awarded a principal judgment in the amount of $669,-218.63, with costs, attorneys' fees, and interest from the date of judgment.

In permitting these credits or set-offs, the court made the following conclusion of law: "It was the duty of plaintiffs to marshal the assets of the principals on said bond, for the benefit of defendants Idaho First National Bank, National Association, as Executor of the Estate of V. A. Roberts, and Ellen N. Roberts, and that although otherwise provided therein, the pledge of assets by K. H. Vitt and Catherine Vitt to American Casualty Company are applicable to the loss sustained by plaintiffs at Amarillo; that the equipment owned by the principals to said contract and bond in the value found by the court of $30,000.00 is applicable to the loss sustained by plaintiffs on said bonds, and that each of said items is a proper matter for setoff against the amount owing by said Idaho First National Bank, National Association, as Executor of the Estate of V. A. Roberts, and Ellen M. Roberts."

The court, it will be noted, there referred to an obligation to "marshal the

assets". We do not construe that to mean that the court was applying the ancient, technical doctrine of marshaling assets. The facts here do not indicate a typical case for marshaling of assets.[3] We merely construe this conclusion to mean that the defendants are entitled to the $380,000 credit.

Before proceeding to an inquiry as to whether the acts of the plaintiff American Casualty operated to release or discharge Roberts to any extent, we note some of the provisions of the indemnity agreement that Roberts signed. The joint venturers were therein named as parties of the first part, American Casualty as party of the second part, and Roberts and wife as parties of the third part. The joint venturers agreed to indemnify American Casualty against all its losses arising out of its bond. The agreement further contained the following paragraphs: "The parties hereto agree that the third parties may, in their own behalf, or in behalf of the second party, but with the approval or consent of the second party, and at the third parties' own cost and expense, exercise all of the rights of the second party under the terms and provisions of each such Application and Indemnification Agreement, copy whereof is attached hereto and made a part hereof, which terms and provisions shall also be deemed to be for the protection and benefit of the third parties."

"The third parties shall be subrogated to all of the rights of the second party for any payment for which the third parties shall become liable to the second party hereunder."

"The third parties shall be subrogated to all of the rights of each of the first parties for any payment for which the third parties may become liable under and by virtue of the terms of this Agreement."

It was also agreed that the first parties would indemnify the third parties and save them harmless against all damages, loss, costs, charges and expenses which the third parties might sustain or incur by reason of having executed this agreement.

The so-called application and indemnification agreement, above referred to, which was attached to and made a part of the September 9, 1958, indemnity agreement by Roberts and wife, provided for payment of premiums for the bond and contained the joint venturers' indemnity agreement made by them with American Casualty. Paragraph 6 of that agreement provided that the indemnitors therein mentioned, namely, the joint venturers, in the event of default or breach of their contract, agreed to assign, transfer and set over to American Casualty, all the joint venturers' right, title and interest in and to all machinery, plant, tools and materials on the site of the work. Paragraph 15 provided that American Casualty should have the right, in the event of default or breach on the part of the joint venturers, to "make demand upon and require the indemnitors to furnish and deposit with the surety or sureties executing said bond or bonds, ample and sufficient collateral to fully protect said surety or sureties against any and all loss and expense", etc. It will be noted that these are some of the rights to which Roberts was entitled to subrogation under his indemnity agreement.

■ In making inquiry as to whether in the circumstances here mentioned Roberts and wife were entitled to assert that they were released from some part of the obligations under their indemnity agreement by the conduct of American Casualty Company above referred to, and, to the extent that they were prejudiced by such acts, we take note of some general rules of law applicable in such cases. "It is a general rule of law that any act on the part of an indemnitee which materially increases the risk, or

3. This is sometimes known as the "two fund doctrine". The basis for the equitable doctrine of marshaling was stated in Sowell v. Federal Reserve Bank, 268 U.S. 449, 456, 457, 45 S.Ct. 528, 69 L.Ed. 1041, and reiterated in Meyer v. United States, 375 U.S. 233, 236, 84 S.Ct. 318, 11 L.Ed.2d 293.

prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity." U. S. Fidelity & Guaranty Co. v. Putfark, 180 La. 893, 158 So. 9, 10. The same principle was set forth in Hiern v. Saint-Paul Mercury Indemnity Co., 5 Cir., 262 F.2d 526, 529, where the court cited and quoted from the last named case with approval.

The rule thus stated indicates that in making inquiry as to what acts on the part of the creditor (or, as in this case, the surety company indemnified) will release the indemnitor, we note the situation of the indemnitor is analogous to that of a surety.[4] It will be noted that in this case three parties are involved, namely, the plaintiff American Casualty Company, the joint venturers and Roberts and wife, indemnitors. Under those circumstances it would appear that after the default of the joint venturers and after the American Casualty Company began to look to Roberts to make good on his indemnity undertaking, Roberts had in fact become a surety. See Restatement, Security § 82, comment l.[5]

It thus appears that appropriate for consideration here is Restatement, Security § 132, as follows: "Where the creditor has security from the principal and knows of the surety's obligation, the surety's obligation is reduced pro tanto if the creditor (a) surrenders or releases the security, or (b) wilfully or negligently harms it, or (c) fails to take reasonable action to preserve its value at a time when the surety does not have an opportunity to take such action."

It will be recalled that under his indemnity agreement Roberts was entitled to be subrogated "to all of the rights of the second party." One of the rights of the second party, that is to say, American Casualty, under the indemnity agreement with the joint venturers, was that

it could, in the event of any default or breach on the part of the joint venturers, "make demand upon and require the indemnitors to furnish and deposit with the surety or sureties * * * ample and sufficient collateral to fully protect said surety against any and all loss and expense. * * * "

Of course, on the 10th day of October, 1959, when American Casualty took the "General Pledge Agreement" from Vitt, et al., Roberts had not paid the loss to American Casualty, but he did have the right ultimately to claim subrogation if as and when he had to pay the amount for which he was liable, whether that came about before or after judgment. In short, Roberts had the inchoate right ultimately to claim subrogation, and a subrogation that would permit him to call upon the joint venturers for that collateral security. When agent Bennett then procured that "General Pledge Agreement," which made the collateral security available primarily to pay the Whidbey Island losses, he completely frustrated and did away with Roberts' existing right ultimately to claim that collateral under his right to subrogation. Precisely in point here is the case of Crosby v. Woodbury, 37 Colo. 1, 89 P. 34, where the court said: "Where a creditor has in his hands or under his control property of the debtor which can be applied to the satisfaction of the debt, the surety for such debt has the right to have the property so applied, and any affirmative act of the creditor which prevents such application releases the surety to the extent he is injured. This rule of law arises from the equities existing between the surety and the principal debtor; that is to say, when the creditor has the means in his hands belonging to the principal which is pledged for the payment of the debt, either by agreement between the principal and creditor, or by

4. See Comment, "Third Party Indemnity Contracts," 39 Neb.L.Rev. 373, 406 (1960).

5. "Much of the confusion which exists in connection with the administration of the rules relating to indemnity and suretyship can be avoided by recognizing that a contract of indemnity may also involve suretyship as a result of subsequent events. In other words, a relationship which involves two persons at the outset may ultimately involve three."

operation of law, the surety is entitled to be subrogated to the rights of the creditor upon paying the debt, and therefore any affirmative act of the creditor which prevents such subrogation releases the surety to the extent he is thereby deprived of property which could be applied to the payment of a debt for which he is secondarily liable." (89 P. at 36.)

Not only did Roberts have these express rights under this indemnity agreement, but by reason of the agreement with the joint venturers, represented by the telegram heretofore quoted, he had other equities which the district court properly recognized in view of the fact that the appellant's agent, and hence the company itself, had full knowledge because of the agent's participation in the sending of the telegram. The assumption of the appellant here is that it had the free and unfettered right to procure the pledge agreement and route the proceeds where it chose; but many cases hold that under these circumstances a person in the position of American Casualty could not do any such act without regard to the equities of the surety or indemnitor.

In Columbia Digger Company v. Sparks, 9 Cir., 227 F. 780, the Digger Company, plaintiff, had furnished crushed rock to the contractors on a public improvement in the city of Vancouver, Washington. The defendants, as sureties, had furnished a bond for the completion of the work and which provided for payment for labor and materials furnished. Under an arrangement made by the contractors, the sums paid by the city upon monthly estimates were paid to a Vancouver bank which disbursed the sums so received. The bank in that manner paid to the plaintiff sums in excess of the value of the ma-

terials furnished for the improvement but the plaintiff applied the sums so received upon previous unsecured indebtedness from the contractors to the plaintiff.

The plaintiff asserted that the contractors had agreed to such application and that plaintiff would look to the sureties for payment of the sums there sued for. The court recognized the general rule that ordinarily a debtor paying money to a creditor has the right to direct the application of his payment, and that in the absence of such direction, the creditor may apply the payment to any of two or more debts owing to him; but it was held in this particular case that there was an equity in favor of the sureties to have the money applied in payment of the debt for which they were liable; and that in view of such special equity, and the facts in that case, the sureties were held discharged since plaintiff had received more than the amount of materials furnished.[6]

In the case before us it is true that American Casualty did not become a formal party to the contract between Roberts and the joint venturers represented by Roberts' letter of August 28, 1958, and the telegram from the joint venturers two days later; but the equity which requires protection of Roberts and wife in this case arises out of the fact that American Casualty Company knew of that agreement; it not only had that notice but it participated in the closing of that agreement.

It would indeed be the height of inequity in this case if under these circumstances Roberts could be deprived of the benefit of the specific stipulation which he himself made as a condition to the execution by him of the indemnity agreement.[7]

6. Other cases in accord are: St. Paul Fire and Marine Insurance Co. v. United States, 309 F.2d 22 (8th cir. 1962); Koehring Co. v. United States, 303 F.2d 468 (10th cir. 1962); U. S. for Use of Carroll v. Beck, 151 F.2d 964 (6th cir. 1945); U. S. for Use of Crane Co. v. Johnson, Smathers & Rollins, 67 F.2d 121 (4th cir. 1933).

7. Numerous illustrations of the effect of such equity may be furnished. Jordan v. Bank of Morrilton, 168 Ark. 117, 269 S. W. 53, is such a case. In that case, Jordan had received from one Turner a mortgage to secure the sum of $2735.29. Turner also owed Jordan a sum of money on an open account for merchandise. Turner then borrowed $6340 from the

The obligation of a person in the position of American Casualty to apply the assets of the principal debtor upon the obligation on which the surety or indemnitor is liable, in cases involving substantial equities, in favor of the surety, is recognized in the Restatement, Security § 131(2) as follows: "The creditor has a duty first to enforce his security interest in the property of the principal, if (a) his failure to do so will result in unusual hardship to the surety, and doing so will not prejudice the creditor, * * *." [8]

We hold therefore that the conduct of the appellant and its agent in taking for itself and its losses on the Whidbey Island the Vitt securities in disregard of Roberts' rights under his agreement with the joint venturers, and the rights which he was assured under the indemnity contract, justified the trial court in holding that, to the extent of the value of those securities, Roberts was released from his obligations under the indemnity agreement. And, for a similar reason, Roberts was properly entitled to the additional credit of $30,000 represented by the machinery, tools and equipment which disappeared from the Amarillo job. This holding of the court must be affirmed.

In its findings and conclusions and in the judgment the court awarded American Casualty the sum above mentioned, $669,218.63, with interest thereon at the rate of 6 per cent per annum from the date of judgment. Appellant argues that the court should have awarded interest at that rate from an earlier date, or, as appellant asserts, "from the date the same became due, being no later than the date of filing complaint against defendant." The Idaho statute providing for the recovery of interest is Idaho Code, § 27-1904 which reads as follows: "Legal rate of interest.—When there is no express contract in writing fixing a different rate of interest, interest is al-

---

bank agreeing with the bank that $2735.-29 of the money so borrowed should be applied toward the payment of the prior mortgage given to Jordan. A check for that amount was given by Turner to Jordan who applied it on the merchandise account. The circumstances showed that Jordan knew and had notice that the bank had furnished the proceeds of the loan upon an understanding that this amount represented by the check was to be paid on the debt secured by the prior mortgage. The court said: "If Jordan had notice of these facts he would not be permitted, even with the consent of Turner, to misapply it. * * * In short, if Jordan had notice that the bank had lent the money upon the understanding that a part of it should be applied towards the payment of his mortgage debt, he could not apply it to the payment of his unsecured debt as against the bank, even with the consent of Turner." 269 S.W. at 54. Precisely in accord with that decision is Brown v. Scheuer, Wise & Co., 210 Ala. 47, 97 So. 50.

8. The comment on this portion of the section is as follows: "While the creditor, as stated in Subsection (1), is under no duty generally to enforce his claim against the principal rather than the surety, where the principal is in default and performance is due from the surety, circumstances of peculiar hardship may give the surety the right to require the creditor to recognize that as between the principal and surety the principal is the one who should perform, and where assets of the principal are available to the creditor, to utilize these before compelling payment by the surety. The surety must show unfairness to himself and no unfairness to the creditor if he is to be able to compel the creditor to depart from the normal procedure of demanding performance from the surety after the principal's default. Where the surety can make such showing, however, equity will recognize that as between surety and principal, the latter is the one who should satisfy the duty, and will require the creditor first to utilize available assets of the principal."

The illustration of this rule stated is as follows: "P is indebted to C in the sum of $5000 secured by a pledge of negotiable securities amounting substantially to the face of the loan. S is surety. Upon P's default C obtains judgment against P and S. S can compel C to sell the pledged securities and apply their proceeds on the debt, and also to levy on other assets of P, if such are available, before levying on assets of S."

lowed at the rate of six cents on the hundred by the year on:

"1. Money due by express contract.

"2. Money after the same becomes due.

"3. Money lent.

"4. Money due on the judgment of any competent court or tribunal.

"5. Money received to the use of another and retained beyond a reasonable time without the owner's consent, express or implied.

"6. Money due on the settlement of mutual accounts from the date the balance is ascertained.

"7. Money due upon open accounts after three months from the date of the last item."

Appellant argues that both subdivision 1 and subdivision 2 of the statute would require that interest be computed at least from the date of the filing of the complaint. Appellant cites Idaho cases holding that in the computation or award of interest it is immaterial whether the claim be liquidated or unliquidated or whether the contracts involved are express or implied; and that in ascertaining when the money became due it is deemed due on an unliquidated claim "where the amount due can be readily ascertainable by mere computation, or by a legal or recognized standard."

█ An examination of the original document composing the court's findings and conclusions indicates that the trial court first awarded plaintiff judgment for interest from the date of the filing of the complaint but before signing the findings struck out such provisions and made the findings recite that interest at the rate indicated would run from the date of the judgment. The court did not state by any order or other ruling how this conclusion was arrived at. Because the able trial judge is, as we know, learned in the law of the State of Idaho, we feel impelled to give much deference to his views as to the meaning of the Idaho statute. It may be inferred from his action that he may have come to the conclusion that this was a case covered by subdivision 6 of the statute relating to "Money due on the settlement of mutual accounts from the date the balance is ascertained." He may well have concluded that the balance was not ascertained until the findings were filed and judgment entered. See Donaldson v. Josephson, 71 Idaho 207, 228 P.2d 941. Of course, as we have indicated, this was a case involving mutual accounts, i. e., the claim of American Casualty for payment under its indemnity agreement, and the claim of Roberts under his cross-claim based upon the facts relating to the diversion of the Vitt collateral to the purposes other than liquidation of the Amarillo losses.

The evidence shows that when it was first thought there would be losses at Amarillo two representatives of Roberts went to Amarillo to check on the loss and one of them testified that the records were very incomplete but it looked as if the losses then would be "in excess of $600,000, possibly $700,000." It also appears from the testimony of Bennett that there were then claims of about $314,000 against the Government for additional work which had been allowed by the contracting officials but not finally agreed to by the Government. Obviously at that time the amount of the loss was still unascertained and uncertain.

We have concluded that under the circumstances of this case the award of interest should be governed by subdivision 6 of the statute above quoted and that interest should be allowed "from the date the balance is ascertained." We are of the opinion that a fair application of that provision would be made by an allowance of interest from the date of the stipulation which was made a part of the pretrial order which was filed and dated September 19, 1961. At that time the amount of the loss was stipulated and the only amount then unascertained was the amount or validity of the cross claims of Roberts.

Accordingly, we hold that the judgment should be modified by providing for the recovery of interest upon the sum of $669,218.63 from the 19th day of Sep-

tember, 1961. In all other respects the judgment is affirmed. Appellant shall recover one-eighth of its costs in this court.

Affirmed as modified.