# FILED

December 22 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 09-0244

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 432

MONTANA RAIL LINK, a Montana Corporation,

        Plaintiff and Appellee,

    v.

CUSA PRTS., LLC, a corporation, d/b/a
POWDER RIVER TRANSPORTATION,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 2006-1268
Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Steven S. Carey, Andrew D. Huppert, Carey Law Firm, P.C.,
            Missoula, Montana

        For Appellee:

            Darla J. Keck, Matthew A. Baldassin, Datsopoulos, MacDonald
            & Lind, P.C., Missoula, Montana

        Submitted on Briefs:  November 18, 2009

        Decided:  December 22, 2009

Filed:

        _____
                          Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 CUSA PRTS., LLC (Powder River), appeals from a decision in the Thirteenth Judicial District Court ordering it to indemnify Montana Rail Link (MRL). We affirm in part, reverse in part and remand for further proceedings consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 MRL contracted with Powder River to provide employee transportation for MRL's workers. MRL and Powder River entered into a contract for services. The contract contained an indemnity provision, which required Powder River to "[i]ndemnify and hold MRL harmless from and against any and all loss, liability, damages, claims, demands, costs and expenses of whatsoever nature arising out [of] contractors [*sic*] actions in performing this agreement."

¶3 Thomas Salazar (Salazar) was a locomotive engineer for MRL. On March 3, 2004, Salazar was injured when a van operated by Powder River was involved in a rollover accident en route to Helena, Montana. As an employee of MRL, Salazar was covered under MRL's "Wellness Program." The Wellness Program is an ERISA-compliant plan created as a result of a collective bargaining agreement entered into between MRL and Salazar's labor union, the Brotherhood of Locomotive Engineers. The Wellness Program provides certain medical and wage continuation benefits for covered injuries. The Wellness Program confers substantial discretion upon the administrator of the Wellness Program regarding eligibility determinations to receive benefits. For instance, Section 2.2 of the Wellness Plan, entitled "Requirements for Benefits for a Covered Injury," reads in part as follows:

(a)     A Qualified Employee who incurs a Covered Injury must notify his or her immediate supervisor; and make and submit to the Company a report (in the manner and at the time required by Plan Rules) of the circumstances giving rise to the Injury.  A Qualified Employee who is a member of a collective bargaining unit must comply with any reporting requirements imposed by the collective bargaining agreement.

.   .   .

(c)     The Plan Administrator has the right to have a Physician of its choice examine the Qualified Employee as needed to determine the extent of the Injury and the limitations restricting work.
(d)     The Plan Administrator has the right to obtain information to administer the Plan, including information to determine eligibility, validity of claims, and the benefits payable under the Plan.  A Qualified Employee must provide the information requested for Plan administration purposes.

.   .   .

(f)     The Plan Administrator is entitled, in its sole discretion, to rely upon the opinion of an independent medical expert's evaluation as to whether medical treatment and/or a work restriction is the direct and proximate result of a Covered Injury.

¶4     Four days after the accident, Salazar filed a personal injury report with MRL. Jacquie Duhame (Duhame) was the program administrator at that time.  Salazar described his injuries as pertaining to his ribs and neck muscles.  Salazar was seen by Dr. Kevin McCrea, M.D., an emergency room physician, on March 8, 2004.  Duhame had preapproved the visit.  Dr. McRea noted that Salazar had right-sided musculoskeletal pain, and gave him medication to treat these symptoms.  On March 10, 2004, Dr. Lawrence Splitter, D.O., performed a return-to-work physical on Salazar.  Salazar reported that he had sore ribs on his right side, soreness from his right hip to the right shoulder blade, and soreness on the right side of his neck.  Dr. Splitter diagnosed Salazar

3

as having "right chest wall contusion, cervical strain, and right hip pain." Dr. Splitter discharged Salazar and cleared him to return to work.

¶5 On March 24, 2004, Salazar was seen by Dr. Patrick Clancy, a chiropractor. Although Salazar was allowed to return to work, he received treatment from Dr. Clancy on March 24 and July 13, 2004, for pain in his neck, shoulders, and back. These visits were preapproved by Duhame. Salazar continued to experience symptoms from the accident. Duhame subsequently approved Salazar to see Dr. Steven Rizzolo, M.D. on October 4, 2004. Salazar's main complaint was low back pain. Salazar also indicated a "little bit of neck and right arm pain" but stated that these were "minor" complaints, and had been occurring prior to the accident. Dr. Rizzolo conducted x-rays of Salazar. Dr. Rizzolo diagnosed Salazar with "probable cervical and lumbar soft tissue sprains, numbness and tingling in his hands." Dr. Rizzolo recommended an MRI to rule out compression of the spinal cord given the hand numbness and tingling, and stiffness in Salazar's neck. Dr. Rizzolo also recommended EMG and nerve conduction velocities of the upper extremities to rule out carpal tunnel syndrome. Dr. Rizzolo suspected that Salazar had soft tissue injuries and simply needed more time to heal.

¶6 Salazar saw Dr. Rizzolo for a follow-up on November 22, 2004. Prior to the visit, Salazar had further diagnostic tests conducted, including x-rays and a bone scan. Based on the results of the tests, Dr. Rizzolo concluded Salazar suffered from soft tissue injuries and sprains. Dr. Rizzolo cleared Salazar for work activities. Dr. Rizzolo also noted that Salazar had numbness and tingling in his hands and recommended EMG studies consistent with the recommendation in the previous exam. EMG tests were conducted by

Dr. Arturo Echeverri on April 19, 2005. Dr. Echeverri concluded that the results of the tests demonstrated neurophysiological evidence of a mild bilateral carpal tunnel syndrome. Dr. Rizzolo subsequently reviewed the test results and diagnosed Salazar with "possible carpal tunnel syndrome." Dr. Rizzolo recommended that Salazar be seen by Dr. Ralph Costanzo, M.D., for further examination of the nature and cause of the carpal tunnel symptoms. In his note, Dr. Rizzolo stated as follows:

> At this point, my only recommendation is for evaluation with Dr. Costanzo. Initially, I think this should be covered by work comp. If he think[s] it is carpal tunnel and not related to the motor vehicle accident, that would be his decision. With regards to his neck and back, he will follow-up with me after he sees Dr. Costanzo. No change in work restrictions. He is at maximum medical improvement for his neck and back.

¶7　On August 31, 2005, Dr. Costanzo examined Salazar. Salazar reported developing numbness and tingling in his hands radiating proximally into his forearms roughly four weeks after the accident. Dr. Costanzo examined Salazar, and performed several tests. Dr. Costanzo concluded that Salazar had mild carpal tunnel syndrome and recommended a conservative management of his symptoms, including the use of corticosteroid injections and splinting. Dr. Costanzo did not place any activity or work restrictions on Salazar. With respect to the causation of his carpal tunnel syndrome, Dr. Costanzo concluded "I am doubtful that his current hand symptoms are likely a result of the motor vehicle accident." Duhame subsequently approved Salazar's treatment of corticosteroid injections with Dr. Costanzo. Salazar had a follow-up visit with Dr. Costanzo on October 10, 2005, where they further discussed Salazar's symptoms, as well as further treatment

5

options including carpal tunnel release surgery. At the time, Salazar indicated that he did not wish to undergo surgery.

¶8 On November 7, 2005, Salazar was referred to Dr. Jeffrey Hansen, M.D. Salazar reported numbness in both hands and pain in his right shoulder. Dr. Hansen suggested that Salazar was suffering from cuff tendonitis bursitis as well as carpal tunnel. Dr. Hansen ordered an MRI and opined that Salazar would likely improve from carpal tunnel surgery. On January 1, 2006, Dr. Hansen saw Salazar again and reviewed his MRI. The results confirmed that Salazar was suffering from carpal tunnel syndrome and tendonitis. Dr. Hansen opined that Salazar had a good chance of improving from carpal tunnel release surgery, and recommended that he have the surgery as well as arthroscopic subacromial decompression of the shoulder.

¶9 On January 18, 2006, Dr. Hansen wrote a letter confirming Salazar's diagnosis of rotator cuff tendonitis and impingement and carpal tunnel syndrome. Dr. Hansen opined that Salazar was in need of carpal tunnel surgery and rotator cuff decompression with arthroscopy. Duhame approved the surgery. Dr. Hansen performed right carpal tunnel release and right shoulder surgery on March 14, 2006, and performed left carpal tunnel release surgery on April 11, 2006. Dr. Hansen released Salazar to return to work on September 18, 2006. After his release, Salazar had follow-up visits with Dr. Hansen. On October 24, 2006, Salazar reported pain in his left hand and right shoulder, especially when engaging the right shoulder in overhead functions. Salazar did not complain of carpal tunnel symptoms. At that time, Dr. Hansen opined that Salazar was permanently

6

totally disabled and recommended that Salazar be pulled from work and placed on long-term disability.

¶10    On December 7, 2006, Salazar filed a negligence suit against Powder River and MRL.  On March 30, 2007, MRL answered and filed a cross claim against Powder River seeking to be indemnified for Salazar's damages, including medical expenses and wage loss claims, as well as attorney fees incurred in its defense of Salazar's claims.  On July 3, 2007, Powder River answered Salazar's complaint, but did not at that time respond to MRL's cross-claim for indemnification.

¶11    On December 10, 2007, Salazar returned to Dr. Rizzolo, complaining of approximately 8 to 10 weeks of progressive back pain and pain in the muscles on both sides of his back.  Dr. Rizzolo ordered a bone scan which came back normal.  Dr. Rizzolo did find some evidence of irritation of the nerves on the left side of his leg and restricted range of motion on his back.  Dr. Rizzolo later testified that the leg symptoms were new, and that he had no explanation for increased back symptoms roughly two and a half years after the accident.

¶12    On April 4, 2008, Dr. John C. Schumpert, M.D., performed an independent medical examination (IME) on Salazar at Powder River's request.  Dr. Schumpert examined Salazar and reviewed his medical records.  Based on his examination, Dr. Schumpert concluded that the van accident did not play even the slightest role in Salazar's bilateral carpal tunnel syndrome and surgery, his right shoulder condition and surgery, or his low back pain.  Dr. Schumpert concluded that the injuries Salazar sustained to his right paracervical muscles, right trapezius muscles, left lateral chest wall,

7

and right lateral hip, all resolved by the time Salazar was evaluated by Dr. Rizzolo on October 4, 2004. Dr. Schumpert concluded that Salazar's inability to work was due to his right shoulder condition, which was totally unrelated to the accident.

¶13 On July 11, 2008, MRL, Salazar, and Powder River entered into a settlement. Salazar agreed to drop his claims against Powder River and MRL for $355,667.54. $260,000 of this amount represented new money to be paid to Salazar. The remaining $95,667.54 represented money previously paid by MRL for medical, wage continuation and disability benefits under the terms of MRL's Wellness Program.

¶14 On December 5, 2008, Powder River responded for the first time to MRL's March 2007 cross-claim for indemnification. Powder River claimed that it was not required to indemnify MRL for costs and fees incurred in its defense of Salazar's claims, nor was it required to indemnify MRL for benefits already paid to Salazar by MRL. Additionally, Powder River claimed that MRL had acted unreasonably in adjusting Salazar's claim, thus barring it from seeking indemnification.

¶15 A bench trial on MRL's indemnification claims was held on February 13, 2009. The District Court received numerous exhibits regarding Salazar's treatment, including deposition testimony from the physicians who treated Salazar. Additionally, the District Court received direct testimony from Duhame concerning her adjustment of Salazar's claims.

¶16 On March 31, 2009, the District Court entered findings of fact and conclusions of law. The District Court ordered Powder River to indemnify MRL for the $95,667.54 expended on Salazar as a result of the March 3, 2004 accident. The District Court also

ordered Powder River to indemnify MRL for attorney fees and costs MRL incurred in its defense of Salazar's claims arising out of the van accident. The District Court denied MRL's claims for attorney fees and costs expended in establishing its right to indemnification.

¶17  In its findings, the District Court reviewed Salazar's medical history and treatment resulting from the van accident. The District Court also considered deposition testimony given by Drs. Rizzolo, Costanzo, and Hansen. Dr. Rizzolo testified that the van accident caused Salazar's cervical and lumbar strain. Dr. Rizzolo also testified that he deferred to Dr. Costanzo on any opinions concerning Salazar's carpal tunnel diagnosis. Dr. Costanzo testified that it was "doubtful" that the van accident had caused Salazar's carpal tunnel symptoms. Dr. Costanzo admitted it was possible that carpal tunnel could arise several weeks after an accident, but in his practice such symptoms arose much closer in time to the injury event. Dr. Hansen testified that Salazar's carpal tunnel and shoulder problems were typically associated with "overuse" and "years of doing overhead related activities," and that carpal tunnel syndrome was generally a "progressive, overuse-related kind of chronic condition." The District Court determined that Dr. Hansen opined Salazar's shoulder and carpal tunnel syndromes were caused by a combination of overuse and injury, and that the accident contributed to Salazar's carpal tunnel symptoms and was a direct cause of his shoulder injury.

¶18  The District Court also reviewed the indemnification provision in the contract for services between MRL and Powder River, as well as the terms of MRL's Wellness Program. The District Court noted that the program administrator has discretion to pay

9

medical expenses and rely on medical evidence, if the employee complies with the Wellness Program's provisions, and reports a "covered injury" pursuant to Section 2.2. *See Opinion*, ¶ 3. The District Court also noted that the program administrator has a fiduciary duty to properly administer claims for the injured employee, and must have a reasonable basis to believe a claim is a covered injury. The District Court determined that Duhame had paid Salazar's claims in accordance with the terms of the Wellness Program.

¶19 The District Court further noted that MRL had incurred defense costs of $62,291.89 in defense of Salazar's claim, and determined that MRL had a contractual right to offset for amounts already paid to Salazar when it entered into settlement negotiations. Further, the District Court noted that Duhame testified that Powder River did not dispute the amount or nature of MRL's payments to Salazar prior to the settlement conference. With regard to the final settlement, the District Court determined that Powder River affirmatively relied upon MRL's prepaid $95,667.54 to negotiate a lower settlement of Salazar's claims.

¶20 In its conclusions of law, the District Court, citing to *Amazi v. Atlantic Richfield Co.*, 249 Mont. 355, 816 P.2d 431 (1991), noted that contracts for indemnification are to be construed liberally in favor of the indemnitee. Citing to *American Cas. Co. of Reading, Pa. v. Idaho First Nat. Bank*, 328 F.2d 138 (9th Cir. 1964), the District Court further observed that any act on the part of an indemnitee which materially increases the risk to, or prejudices the rights of, an indemnitor will discharge the indemnitor under a contract of indemnity. The District Court also noted that because MRL was a railroad

10

subject to the Federal Employer's Liability Act (FELA), the obligation to indemnify MRL was broader than that in a traditional negligence action because MRL's duty towards its employees was greater. *See Norfolk & Western Ry. Co. v. Ayers*, 538 U.S. 135, 145, 123 S. Ct. 1210, 1216-17 (2003) ("FELA renders common carrier railroads liable in damages to any person suffering injury while . . . employed by [the] carrier if the injury or death result[ed] in whole or in part from the [carrier's] negligence.") (quotation omitted, alterations in original); *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S. Ct. 443, 448 (1957) (Liability is established under FELA if the employer's "negligence played any part, even the slightest, in producing the injury or death for which damages are sought.").

¶21 With these principles as well as the provisions of the indemnity agreement and Wellness Program in mind, the District Court concluded Duhame properly determined that Salazar had suffered a covered injury entitling him to the payment of benefits. The District Court concluded that Duhame properly exercised her discretion to obtain and review medical evidence, and that she had a reasonable basis to believe Salazar's claims were covered under the Wellness Program. Specifically, the District Court noted that none of the health care providers in this case expressly ruled out the van accident as the cause of Salazar's injuries. Additionally, Salazar's own statements indicated that his symptoms got progressively worse after the accident, and that he had not complained of any symptoms prior to the accident. Accordingly, the District Court concluded that Duhame carried out her duties as program administrator in good faith, in accordance with ERISA and the terms of the plan, and in no way materially increased the risk to, or

11

prejudiced the rights of, Powder River. Furthermore, the District Court noted that Powder River acknowledged Salazar's injuries and their cause when it utilized monies already paid by MRL to reach a settlement.

¶22 Finally, the District Court concluded that MRL was entitled to be indemnified and held harmless for all amounts paid as costs of defense, including attorney fees, as a result of the claim asserted against it by Salazar.

¶23 Powder River now appeals from the District Court's decision. We state the issues presented by this appeal as follows:

¶24 **Issue One:** *Did the District Court err in ordering Powder River to indemnify MRL for medical bills and wage loss benefits it paid to Salazar prior to settlement?*

¶25 **Issue Two:** *Did the District Court err in ordering Powder River to indemnify MRL for attorney fees and costs incurred in its defense against Salazar's claim?*

**STANDARD OF REVIEW**

¶26 We review findings of fact in a bench trial in a civil action to determine whether there is substantial credible evidence to support those findings. *DeNiro v. Gasvoda*, 1999 MT 129, ¶ 9, 294 Mont. 478, 982 P.2d 1002. We view this evidence in a light most favorable to the prevailing party. *DeNiro*, ¶ 9. Conclusions of law are reviewed for correctness. *DeNiro*, ¶ 9.

¶27 **Issue One:** *Did the District Court err in ordering Powder River to indemnify MRL for medical bills and wage loss benefits it paid to Salazar prior to settlement?*

¶28 Powder River claims the District Court erred in ordering it to indemnify MRL for Salazar's medical and wage loss benefits. First, Powder River asserts that the indemnity

12

provision pertains only to claims "arising out of" its negligence. Here, Powder River asserts that Salazar's shoulder, carpal tunnel, and lumbar conditions did not arise out of the March 3, 2004 accident, but were due to his work as a locomotive engineer for MRL. Powder River claims the District Court erred in concluding otherwise based on the evidence before it, and asserts that the medical evidence shows these conditions were not related to the accident. Powder River claims the District Court concluded that Salazar's conditions were related to the accident simply because none of the treating physicians conclusively ruled out a relationship between these injuries and the accident. Powder River argues this reasoning is illogical and insufficient to prove causation of these conditions, especially in the face of substantial credible evidence showing that the carpal tunnel, shoulder, and lumbar conditions were not related to, or caused by, the van accident.

¶29    Second, Powder River asserts that the District Court erred in concluding that Duhame properly adjusted Salazar's claim under the Wellness Program. Powder River notes that an indemnitee (i.e., MRL) has a good faith obligation not to materially increase the risk to, or prejudice the rights of, an indemnitor (here, Powder River). Powder River claims that Duhame failed to adjust Salazar's claim in good faith because she paid every bill, without inquiry, and exposed Powder River to risk for injuries which were not related to the van accident. Powder River argues that the medical evidence available to an adjuster should demonstrate some causal link between the work-related accident and the claimed injury, and that the medical evidence here established no such link.

¶30 In fact, Powder River asserts that the medical evidence casts doubt on whether these conditions were actually related to the accident, and indicates that the carpal tunnel, shoulder, and lumbar conditions were caused by Salazar's work for MRL as a locomotive engineer, and not by the van accident. Powder River notes that Dr. Schumpert conducted an IME and specifically concluded that these conditions were work-related, and not caused in the slightest degree by the van accident. As a result, Powder River claims that it was prejudiced by Duhame's actions in adjusting the claim, and that it should be discharged from the obligation to indemnify MRL.

¶31 In response, MRL asserts that Duhame made a reasonable determination to pay benefits to Salazar under the Wellness Program. Citing to *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005), MRL claims that so long as Duhame's decision was made in good faith upon a reasonable interpretation of the plans terms, it should be upheld. MRL argues that because Salazar's injury occurred during the scope and course of his employment, and none of the treating physicians specifically ruled out the van accident as the cause of his conditions, Duhame's decision was reasonable. MRL asserts that Duhame did not need to be absolutely certain of causation to pay benefits under the Wellness Program so long as her decision was reasonable, and that requiring Salazar to conclusively prove causation would defeat the purpose of the ERISA-based Wellness Program.

¶32 Further, MRL claims that the broad language of the indemnity provision covers Salazar's claims because they arose out of the accident, and that Powder River must indemnify it for payment of Salazar's medical and wage loss benefits. Additionally,

14

MRL suggests that Powder River is estopped from denying indemnification based on the position it took during settlement negotiations, and the fact that it relied upon monies MRL had already paid to Salazar in negotiating a reduced final settlement.

¶33 As an initial matter, we agree with the District Court that Duhame was acting within her discretion when she paid medical and wage loss benefits to Salazar under the Wellness Plan. Because MRL is covered by FELA, if its negligence plays any part in injuries to Salazar, however slight, it bears responsibility for damages. *See Rogers*, 352 U.S. at 506, 77 S. Ct. at 448. Furthermore, the ERISA-based Wellness Program confers both significant discretion and fiduciary responsibilities upon the program administrator with regard to Salazar's claims. *See Boyd*, 410 F.3d at 1178. The decision of a program administrator in this context is generally reviewed for an abuse of discretion and will not be reversed unless "it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd*, 410 F.3d at 1178. Duhame's decision to pay benefits to Salazar did not constitute an abuse of discretion.

¶34 Separate and apart from Duhames' obligations to Salazar, however, stand MRL's duties to Powder River due to the indemnitor-indemnitee relationship between these two parties. In *First Jersey Nat. Bank v. Dome Petroleum Ltd.*, 723 F.2d 335 (3rd Cir. 1983), the Third Circuit discussed the nature of this fiduciary relationship, and stated that if an indemnitee is responsible for putting an indemnitor in a "precarious position" whereby it is increases the indemnitor's risk of loss, then the duty to indemnify may be discharged. *First Jersey*, 723 F.2d at 342. In this case, Powder River argues that Duhame

15

unquestioningly paid claims which had nothing to do with the van accident, and in doing so increased the risk it would end up paying for claims which were related to Salazar's work with MRL, and not the van accident. Because Powder River should bear no risk of loss for Salazar's work-related conditions, it argues that Duhame's adjusting methods prejudiced it and warrants its discharge from the indemnity obligation.

¶35   Powder River's argument in this regard has arguable merit. Salazar was referred to Dr. Costanzo for the specific purpose of evaluating his carpal tunnel symptoms. Dr. Costanzo's opinion cast doubt on whether this condition was actually a result of the accident. *See Opinion*, ¶ 7. While Duhame certainly had an obligation to pay Salazar under the Wellness Plan, she also owed a duty to Powder River, as an indemnitor, to make sure it would not be exposed to risk of loss for injuries which did not result from Powder River's alleged negligence. Once Dr. Costanzo indicated "doubt" as to whether Salazar's carpal tunnel symptoms were caused by the van accident, Duhame should have ordered an IME in order to protect Powder River from overexposure. Thus, to the extent Duhame failed to take sufficient steps to protect Powder River's interest as the law of indemnity requires, Powder River would be entitled to discharge of its obligation to the extent that MRL's actions materially increased its risk of loss and caused Powder River damage. *See Gen. Ins. Co. of Am. v. Fleeger*, 389 F.2d 159, 161 n. 3 (5th Cir. 1968).

¶36   As Powder River correctly notes, the Ninth Circuit has expressly stated that the principle for discharging an indemnitor's obligation on this basis is derived by analogy from the law of surety. *See Am. Cas. Co.*, 328 F.2d at 143. In other words, the relief requested by Powder River in this case derives not from statute or the common law, but

instead solely from principles of *equity*.  *See Am. Cas. Co.*, 328 F.2d at 143-45.  As we have previously stated, parties must not expect relief in equity unless they come into court with "clean hands."  *Cowan v. Cowan*, 2004 MT 97, ¶ 16, 321 Mont. 13, 89 P.3d 6.  In order to secure relief in equity, a party "is required to come into court with clean hands, and with a cause whose ethical qualities [are] such as to commend it to the conscience of the court."  *Seifert v. Seifert*, 173 Mont. 501, 506, 568 P.2d 155, 158 (1977).

¶37    Prior to settlement negotiations, Dr. Schumpert performed an IME at Powder River's request and concluded that the van accident did not cause any of the conditions for which MRL had already paid Salazar.  Yet, Powder River never provided notice to MRL that it would challenge its right to seek indemnification until over 4 months after the settlement, after it had relied upon these prepaid monies to leverage a lower settlement with Salazar.  Indeed, it did not respond to or contest MRL's cross-claim for indemnification for over a year and a half.  The District Court specifically found that "Powder River relied upon MRL's prepaid $95,667.54 to negotiate a lower settlement of Salazar's claims.  Powder River now refuses to reimburse MRL."  Powder River claims it is excused from indemnifying MRL on the basis that the previously-paid medical and wage loss benefits were not related to Salazar's accident-related injuries.  If that were so, then it should not have taken advantage of MRL's prepaid monies to negotiate a lower settlement figure.  It would be inequitable to allow Powder River to refuse to indemnify MRL, while at the same time receiving the benefit of paying a smaller portion of the settlement to which it already agreed.  Based on Powder River's failure to notify MRL

17

prior to settlement that it would challenge MRL's right to indemnification, we conclude that Powder River does not come into court with clean hands and may not avail itself of the equitable relief it now seeks.

¶38 Accordingly, we affirm the District Court's conclusion that Powder River is required to indemnify MRL for the wage loss and medical benefits it has paid to Salazar. We agree with the District Court that Duhame had a reasonable basis to pay Salazar under the terms of the ERISA-based Wellness Program. However, we do not conclude that Duhame adequately discharged the duties she owed to Powder River as an indemnitor. Duhame's failure to request an IME in order to separate Salazar's work-related claims from those related to the van accident arguably increased Powder River's exposure to a risk of loss beyond that which it agreed to indemnify. However, Powder River may not be discharged from its obligation to indemnify MRL because it does not come into court with clean hands. Thus, although we do not entirely agree with the District Court's reasoning, we affirm because the District Court ultimately reached the right result. *See State v. Hendershot*, 2009 MT 292, ¶ 33, 352 Mont. 271, 216 P.3d 754.

¶39 **Issue Two:** *Did the District Court err in ordering Powder River to indemnify MRL for attorney fees and costs incurred in its defense against Salazar's claim?*

¶40 In awarding MRL attorney fees and costs incurred in defending against Salazar's claim, the District Court relied upon § 28-11-315, MCA, which reads as follows:

> An indemnity against claims, demands, or liability, expressly or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith and in the exercise of a reasonable discretion.

18

¶41 The District Court determined that MRL's defense costs against Salazar's claims were incurred in good faith and in the exercise of reasonable discretion, and thus § 28-11-315, MCA, applied to support an award of attorney fees and costs. The District Court also noted the broad language of the indemnity provision between MRL and Powder River. *See Opinion*, ¶ 2.

¶42 Powder River asserts the District Court erred. Citing to *Transaction Network, Inc. v. Wellington Technologies, Inc.*, 2000 MT 223, 301 Mont. 212, 7 P.3d 509, and *United Nat. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 269, 352 Mont. 105, 214 P.3d 1260, Powder River argues that attorney fees are not available pursuant to the "American Rule" unless specifically provided by contract or statute. Powder River claims the indemnity provision itself does not specifically provide for an award of attorney fees. Further, Powder River maintains that the District Court erred in relying upon § 28-11-315, MCA, as a statutory basis for an award of attorney fees. Powder River notes that § 28-11-315, MCA, allows an award for the "costs of defense," but not for an award of attorney fees. Powder River cites to *Trustees of Ind. University v. Buxbaum*, 2003 MT 97, ¶ 30, 315 Mont. 210, 69 P.3d 633, and *Martin v. Randono*, 191 Mont. 266, 270, 623 P.2d 959, 962 (1981), for the proposition that "costs of defense" do not include attorney fees. Because there is no express contractual basis for an award of attorney fees, and because § 28-11-315, MCA, provides only for an award of "costs," but not attorney fees, Powder River argues the District Court's award of attorney fees must be reversed.

¶43 MRL claims that § 28-11-315, MCA, does support the award of attorney fees in this case, and that the term "costs of defense" should be construed to include attorney

19

fees. MRL argues that California courts and the Ninth Circuit have interpreted identical language in California statutes to conclude that the "costs of defense" in the indemnity context includes attorney fees. *See Davis v. Air Technical Indus., Inc.*, 582 P.2d 1010 (Ca. 1978); *DeWitt v. Western Pac. R.R. Co.*, 719 F.2d 1448, 1453 (9th Cir. 1983). MRL also notes that the Fifth Circuit has upheld an award of attorney fees based on an indemnity agreement which was no more specific than the one present in this case, and did not specifically reference attorney fees. *See Signal Oil & Gas Co. v. Barge W-701*, 654 F.2d 1164, 1177-78 (5th Cir. 1981). Finally, MRL notes that the Alaska Supreme Court has recognized the "general rule" that in "actions of indemnity, brought where the duty to indemnify is either implied by law or arises under contract, *and no personal fault of the indemnitee has joined in causing the injury,* reasonable attorney's fees incurred in resisting the claim indemnified against may be recovered as part of the damages and expenses." *D.G. Shelter Products Co. v. Moduline Indus., Inc.*, 684 P.2d 839, 841 n. 5 (Alaska 1984) (quotation omitted, emphasis in original). MRL argues that it is also entitled to attorney fees under this general rule.

¶44 Because our disposition of this matter is governed by Montana law, citations to other jurisdictions are not persuasive in this case. First, this Court's precedent establishes that attorney fees are not available in the absence of a specific contractual provision or statutory basis providing for attorney fees. *St. Paul Fire*, ¶ 37; *Transaction Network*, ¶ 22. Although the indemnity provision in this case is broadly worded, it does not specifically provide for an award of attorney fees. Thus, the indemnity provision itself does not provide a basis for an award of attorney fees. We agree with Powder River that

20

the parties could have included a provision for an award of attorney fees in the indemnity agreement but did not do so. While some jurisdictions such as Alaska allow attorney fees in the indemnity context irrespective of whether attorney fees are specifically mentioned, we have not adopted this general rule in Montana, and MRL has not presented a persuasive argument as to why this Court should adopt a new exception to the American Rule in the present case.

¶45 Furthermore, we agree with Powder River that the District Court erred in awarding attorney fees on a statutory basis pursuant to § 28-11-315, MCA. "We interpret a statute first by looking to its plain language. Language that is clear and unambiguous requires no further interpretation." *Gannett Satellite Info. Network, Inc. v. State of Mont., Dept. of Revenue*, 2009 MT 5, ¶ 20, 348 Mont. 333, 201 P.3d 132. The distinction between "costs" and "attorney fees" is well-established in Montana; "costs" do not generally include "attorney fees." *Buxbaum*, ¶ 30 (quoting *Martin*, 191 Mont. at 270, 623 P.2d at 962). Section 28-11-315, MCA, therefore does not provide a statutory basis for an award of attorney fees in this case.

## CONCLUSION

¶46 We affirm in part and reverse in part. The District Court correctly concluded that Powder River was required to indemnify MRL for medical and wage loss benefits paid to Salazar. However, the District Court erred in concluding that Powder River must indemnify MRL for attorney fees in this case, as nothing in the indemnity agreement or § 28-11-315, MCA, provides a basis for this award. MRL is entitled, however, to an award of any "costs" incurred in its defense against Salazar's claims pursuant to

21

§ 28-11-315, MCA. Accordingly, we remand this matter to the District Court for further proceedings consistent with this Opinion.


/S/ PATRICIA O. COTTER


We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ JIM RICE
/S/ BRIAN MORRIS